IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

RONNIE BROOKS

Plaintiff,

Civ No. 2:24-cv-01276

vs.

JOSHUA THOMAS, T'MADRE HARRIS, JAMES TEAGUE, TAIWAN SMITH, JONAH TREVINO, AND THE CITY OF HOBBS,

Defendants.

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiff Ronnie Brooks ("Brooks" or "Plaintiff"), by and through undersigned counsel, files this Motion for Partial Summary Judgment and Memorandum in Support on the following issues: (1) liability of Defendants Thomas, Harris, Teague, Smith, and Trevino ("Defendant Officers") on Plaintiff's Count II – Section 1983 claims; (2) liability of Defendant City of Hobbs (the "City") on Plaintiff's Count I – New Mexico Civil Rights Act claim; and (3) Defendants' affirmative defense No. 1 of qualified immunity. In support, Plaintiff states as follows:

## I. INTRODUCTION

There is no factual dispute about what happened in this case as all the relevant facts are contained in the Defendant Officers' police body camera videos[1] and are admitted in Defendants'

[1] Exhibit A-1 is non-party Van Zandt's body camera video. Exhibit A-2 is Teague's body camera video. Exhibit A-3 is Thomas' body camera video. Exhibit A-4 is Trevino's body camera video. Exhibit A-5 is intentionally omitted. Exhibit A-6 is Harris' body camera video. Smith did not turn on his body camera during the incident in question.

Answer.[2] In sum, an elderly man called 911 and reported that another man was chasing him with a gun. Six Hobbs police officers reported to the scene. The elderly victim identified his assailant only by the name "Keith Wright" with no other identifiers and pointed toward a group of houses down the street, saying Wright may be inside.

Equipped with only this scant information, two of the officers (Teague and Thomas) decided they had cracked the case and, without telling the elderly man, ordered their fellow officers to investigate a young black man sitting outside on the sidewalk down the street (Plaintiff), who was doing nothing suspicious. None of the officers inquired with the victim if Plaintiff was the assailant, nor did the victim indicate as much.

A minute later, while one of the officers was still speaking with the victim, three officers surrounded the young male "suspect," Plaintiff Ronnie Brooks, who at 5'5, 134 pounds was much smaller than the officers. Upon surrounding him, these three officers did not ask Brooks if his name was Keith Wright. Rather, they grabbed his arms and ordered him to stand up. When Brooks panicked and tried to run away, the officers easily gang-tackled him, restrained Brooks' arms and legs, and tased him three times.

A few minutes later, back down the street, the elderly victim expressed confusion about why the officers detained and tased *Brooks* when he had identified *Keith Wright* as the perpetrator. At this point it was the officers' turn to panic, and they attempted to gaslight the elderly man by telling him, falsely, that he *had* identified Brooks as his assailant. The victim replied, truthfully, no—I did not identify Brooks. Nonetheless, one of the officers, Trevino, inserted the officers' gaslighting falsehood into a criminal complaint against Brooks, which the City of Hobbs[3] used to file resisting/evading/obstructing (REO) charges against Brooks.

---

[2] *See* Dkt. #4 ("Answer").
[3] The false criminal complaint is attached as Exhibit A-12.

Brooks retained counsel and sought to suppress the prosecution's evidence, as his detention was not supported by reasonable suspicion and hence unconstitutional under the United States and New Mexico Constitutions. The Municipal Court granted Brooks' motion and issued a detailed opinion, summarizing law enforcement's myriad violations of Brooks' constitutional rights, and criticizing Trevino for lying in his criminal complaint.[4]

The above facts are not in dispute. The whole episode is on video; the criminal complaint and Municipal Court opinion are public records; and Defendants have admitted the relevant facts in their Answer. And as explained below, these facts demonstrate a violation of Brooks' clearly established constitutional rights. Thus, Brooks moves for summary judgment on the issue of Defendants' liability under his Section 1983 and New Mexico Civil Rights Act claims, and on Defendants' qualified immunity defense.

## II. STATEMENT OF MATERIAL FACTS

### A. Non-Party Willie Haynes Reports Non-Party "Keith Wright" Chasing Him With a Gun.

1. On August 3, 2024, non-party Willie Haynes ("Haynes") called 911 and reported that a man was chasing him with a gun.[5]

2. Six officers reported to Haynes' location.[6] These officers included Defendant Officers Thomas, Harris, Teague, Smith, and Trevino, and non-party Officer James Van Zandt ("Van Zandt").[7]

3. Upon the officers' arrival, Van Zandt asked Haynes about the incident and the purported assailant.[8]

[4] The opinion is attached as Exhibit A-7. The Municipal Court's tongue-thrashing of the City did not end the City's harassment of Brooks. As explained further below (Part II.D, *infra*), the City tried to appeal the Municipal Court's order on the Motion to Suppress to the District Court, but this was improper as the Municipal Court's suppression order was not appealable under New Mexico law, and Brooks' case had not yet been dismissed. Eventually, the City dismissed its so-called appeal.
[5] Answer at ¶1.
[6] Exs. A-1 through A-6; Answer at ¶11.
[7] *Id.*
[8] Ex. A-1 at 9:10:30, *et seq.*; Answer at ¶11.

4. Haynes told Van Zandt that a man had chased Haynes around the neighborhood with a gun.[9]

5. Haynes identified the purported assailant as "Keith Wright."[10]

6. Haynes gestured toward the western end of the street, which was approximately 100 yards away, and said the person who assaulted him was "at that house."[11]

7. As the body camera footage shows, Haynes was not pointing at any individual person; he was pointing at a group of houses.[12] There were at least three houses in the area at which he pointed, and it was not even clear which house Haynes had identified.[13] Later, during sworn testimony at a suppression hearing, Trevino would admit that Haynes had pointed in the "general direction" of the three houses.[14]

8. During this initial interaction between Haynes and Van Zandt, three other officers were within earshot of Haynes—Teague, Trevino, and Thomas.[15] Harris and Smith were still in or near their patrol cars on the other side of the street.[16]

9. At no time during this initial interaction did Haynes describe the height, build, race, age, or appearance of his purported assailant.[17]

10. None of the officers asked Haynes for any identifying information about the assailant, and Haynes did not provide any such information.[18]

11. About 20 seconds into Van Zandt's conversation with Haynes, Teague turned to Thomas

[9] *Id.*
[10] *Id.*
[11] Ex. A-1 at 9:10:30, *et seq.*; Answer at ¶12.
[12] Ex. A-1 at 9:10:30, *et seq.*
[13] *Id.*
[14] Ex. B (Brooks Declaration).
[15] Ex. A-2 (Teague); Ex. A-3 (Thomas); Ex. A-4 (Trevino); Answer at ¶15.
[16] *Id.*
[17] Ex. A-1 at 9:10:30, *et seq.*; Answer at ¶16.
[18] Exs. A-1 through A-4; Answer at ¶16.

and identified "that guy in the white shirt" as the purported assailant.[19]

12. The man Teague identified was Plaintiff Ronnie Brooks, a young black man sitting on the sidewalk about 100 yards away.[20]

13. To be clear, at no point did Haynes say his assailant wore a white shirt, nor did Haynes tell the officers that the person sitting 100 yards down the street was the assailant.[21] At no point did the officers ask Haynes if the man sitting on the sidewalk was the assailant.[22] None of the officers asked Haynes if the man Teague identified was the assailant.[23]

**B. Trevino, Smith, and Harris Detain Plaintiff and Tase Him.**

14. Acting on Teague's "tip," Thomas told the other officers that the white-shirted individual down the street was the likely assailant.[24] Thomas instructed Trevino, Harris, and Smith to investigate this individual.[25]

15. In addition, Teague instructed Smith: "Will you go make contact with the guy in the white shirt? He [Haynes] is saying that he's the one who pulled the gun on him."[26]

16. Thomas, Teague, and Van Zandt stayed behind with Haynes, and Van Zandt continued to question Haynes about the incident and his assailant while Thomas and Teague listened.[27] Haynes said nothing further to identify his assailant, and the officers still did not ask Haynes if the young black man down the street was his assailant.

17. Trevino, Harris, and Smith got into two patrol cars and drove the 100 yards down the

[19] Exs. A-2 and Ex. A-3 at 9:10:45; Answer at ¶17.
[20] Answer at ¶17.
[21] Exs. A-1 through A-4; Answer at ¶18.
[22] *Id.*
[23] *Id.*
[24] Ex. A-3 at 9:11:00; Answer at ¶19.
[25] *Id.*
[26] Ex. A-2 at 9:11:03.
[27] Ex. A-3 at 9:11:10, *et seq.*; Answer at ¶20.

street toward Brooks.[28]

18. The three officers exited their patrol cars and approached Brooks, who was sitting on the sidewalk.[29]

19. As Trevino would later admit under oath at the suppression hearing, Brooks was not doing anything suspicious.[30]

20. Despite Trevino's knowing the assailant's name was Keith Wright, neither he nor his fellow officers asked Plaintiff his name.[31] Instead, officers Trevino and Smith put their hands on Brooks' elbows and forced him to rise to a standing position.[32]

21. Smith told Brooks that he was being detained because he had been accused of pointing a gun at someone.[33] Of course, Smith's statement was not true. Haynes had not identified Brooks as his assailant.[34]

22. Brooks told the officers, "I just got here"; he told them he had no gun; and he told them he had not pulled a gun on anyone.[35] Brooks said he was not resisting and offered to explain his presence on the sidewalk to the officers.[36]

23. The officers ignored Brooks, and Trevino and Smith physically forced Brooks to stand up.[37]

24. At this point, Harris asked Plaintiff his name.[38] Plaintiff answered, "Ronnie Brooks."[39]

---

[28] Ex. A-4 at 9:11:15, *et seq.*; Answer at ¶21.
[29] Ex. A-6 at 9:12:01.
[30] Ex. B (Brooks Declaration).
[31] Exs. A-4 and A-6 at 9:12:05; Answer at ¶23.
[32] Exs. A-4 and A-6 at 9:12:10; Answer at ¶23.
[33] Exs. A-4 and A-6 at 9:12:15; Answer at ¶24.
[34] *Supra* Part II.A; Answer at ¶24.
[35] Exs. A-4 and A-6 at 9:12:16, *et seq.*; Answer at ¶25.
[36] Exs. A-4 and A-6 at 9:12:25, *et seq.*; Answer at ¶25.
[37] Exs. A-4 and A-6 at 9:12:30, *et seq.*; Answer at ¶26.
[38] Exs. A-4 and A-6 at 9:12:45, *et seq.*; Answer at ¶27.
[39] *Id.*

25. Despite Brooks' name not matching that of the assailant, the officers continued to detain Brooks.[40] Brooks yelled for an "Uncle Keith!" (potentially Keith Wright), but the officers ignored this.[41]

26. Once the officers forced Brooks to stand, Trevino began to handcuff Brooks, at which point Brooks tried to run away.[42]

27. The three officers proceeded to gang tackle Brooks to the ground, which was not difficult considering that each officer was far larger than Brooks, who was around 5'5, 134 pounds.[43]

28. As can be seen from the body camera footage, shortly after the gang tackle, Brooks went down to the ground.[44] Smith pressed his arm against Brooks' back and used his knee to immobilize Brooks' legs.[45] The hands of all three officers were holding Brooks' left arm.[46] Brooks' right arm was pressed against the ground.[47] Trevino used one hand to help Smith hold Brooks' legs in place.[48]

29. Brooks—who was now wholly incapable of moving—shouted again and again, "I'm not moving! I'm not moving!"[49] Mr. Brooks also repeated his prior statements about how he had done nothing wrong and had just arrived.[50]

30. Harris responded to Brooks' pleas by tasing him in the lower back.[51]

31. Brooks screamed in agony and continued to profess that he had done nothing wrong.[52]

---

[40] *Id.*
[41] *Id.*
[42] Exs. A-4 and A-6 at 9:12:50; Answer at ¶28.
[43] Exs. A-4 and A-6 at 9:12:50, *et seq.*
[44] Exs. A-4 and A-6 at 9:12:55; Answer at ¶28.
[45] Exs. A-4 and A-6 at 9:13:02, *et seq.*; Answer at ¶28.
[46] *Id.*
[47] *Id.*
[48] *Id.*
[49] *Id.*; Answer at ¶31.
[50] *Id.*
[51] Ex. A-6 at 9:13:20, *et seq.*; Answer at ¶¶1, 32. In Paragraph 1 of Defendants' Answer, Defendants admit to tasing Plaintiff three times. In Paragraph 32, they admit to Harris tasing Plaintiff twice. Whether Plaintiff was tased two or three times is not material to Plaintiff's Motion.
[52] Exs. A-4 and A-6 at 9:13:30, *et seq.*; Answer at ¶33.

32. Thomas and Teague arrived from down the street and joined their fellow officers in the manhandling of Brooks.[53]

33. The five Defendant Officers handcuffed Mr. Brooks and placed him under arrest.[54] Van Zandt remained down the street with Haynes.[55]

34. The Defendant Officers arrested Brooks for resisting, evading, or obstructing a law enforcement officer, a violation of Section 9.04.080 of the Hobbs Municipal Code, and tossed him in jail.[56]

**C. Trevino Lies About What Haynes Told Officers, Leading to the Malicious Prosecution of Plaintiff.**

35. Shortly after arresting Plaintiff, Harris walked back down the street to Van Zandt and Haynes.[57]

36. Haynes expressed surprise and disbelief that the officers had arrested Brooks, remarking "Noooo!" and "That ain't Keith Wright!"[58]

37. Haynes reiterated his statement that Keith Wright was ***inside*** the house, not sitting on the sidewalk.[59]

38. Haynes also said that Keith Wright was in his sixties, much older than Brooks.[60]

39. Harris attempted to gaslight Haynes into believing Haynes *had* identified Brooks as the assailant, but Haynes refused to go along.[61]

40. Nonetheless, Trevino filed a criminal complaint against Brooks for REO for attempting

[53] Exs. A-2 and A-3 at 9:13:30; Answer at ¶34.
[54] Exs. A-2 and A-3 at 9:13:30, *et seq.*; Answer at ¶35.
[55] Ex. A-1 at 9:13:30; Answer at ¶36.
[56] Ex. A-12; Answer at ¶37.
[57] Ex. A-6 at 9:16:55, *et seq.*; Answer at ¶38.
[58] *Id.*
[59] *Id.* This made sense given it would be unlikely for a gun-wielding assailant to sit casually on a sidewalk 100 yards from where the police were interviewing the assailant's victim.
[60] *Id.*; Answer at ¶40.
[61] Ex. A-6 at 9:17:25, *et seq.*

to run away.[62]

41. Trevino's criminal complaint stated that Haynes "advised the male that pointed the firearm at him was wearing a white shirt, gray pants, and had a beard."[63]

42. Trevino's criminal complaint further stated that Haynes "pointed to a male subject that was sitting on the curb down the street and stated it was that male."[64]

43. These statements were significant because they constituted Defendant Officers' purported basis for detaining Plaintiff, which was the basis for the REO charge.[65]

44. Of course, as the body camera footage confirmed, neither statement in the criminal complaint was true.[66]

45. Haynes had *not* said his assailant was wearing a white shirt with gray pants and a beard, and Haynes had *not* pointed to Brooks.[67]

46. Trevino knew these statements were not true because he was about fifteen feet away while Van Zandt was talking to Haynes.[68]

47. Nonetheless, Trevino signed the false criminal complaint.[69]

48. Notably, Trevino would later file an incident report for the police department's records that contradicted the criminal complaint.[70] The incident report said (accurately) Haynes had not identified Plaintiff as the assailant and had not provided officers with any identifying information about Keith Wright.[71]

---

62 Ex. A-12 (criminal complaint); Answer at ¶42.
63 Ex. A-12 at 1; Answer at ¶43.
64 *Id.*
65 Answer at ¶44.
66 *See supra* at Part II.A; Answer at ¶45.
67 *Id.*
68 Ex. A-4 at 9:10:30.
69 Ex. A-12 at 1; Answer at ¶47.
70 Ex. A-13; Answer at ¶47.
71 *Id.*

49. The criminal complaint was never amended to remove the false and leading statements.[72]

**D. The Municipal Court Dismisses Plaintiff's Case and Chastises Defendant Officers.**

50. As part of the criminal proceedings, Plaintiff filed a motion to suppress all evidence against him.[73]

51. The motion was heard by the Hobbs Municipal Court on October 31, 2024, and granted from the bench.[74]

52. On November 4, 2024, the Municipal Court issued an order describing in detail Defendant Officers' improper conduct and explaining why the detention of Mr. Brooks was not supported by applicable law.[75]

53. The Municipal Court concluded:

> "The original complaint contains inaccurate and misleading information and was never amended. Court also finds that sufficient time had elapsed between the time reported and time contact was made with the defendant to allow for a more thorough investigation, the defendant was never asked his name until after arrest was executed. Court finds that there was insufficient evidence to justify the *Terry* stop. *State v. Mortinez*, 2020-NMSC-005. Motion to Suppress is hereby granted."[76]

54. On or around November 13, 2024, the City filed a Notice of Appeal to the District Court with respect to the Municipal Court's order.[77] This "appeal" was improper, however, as the Municipal Court had never dismissed charges against Brooks, and there is no mechanism for an interlocutory appeal of the Municipal Court's order on a suppression motion.[78] As such, on November 13, Brooks moved to dismiss the appeal.[79]

---

[72] Answer at ¶48.
[73] Ex. A at ¶17.
[74] *Id.* at ¶18.
[75] Ex. A-7.
[76] Id.
[77] Ex. A-8.
[78] Ex. A-9.
[79] *Id.*

55. On or around December 30, 2024, the City moved to withdraw its appeal and sought remand of the case back to the Municipal Court.[80]

56. On January 2, 2025, the City represented to Brooks' counsel that all charges against Brooks in Municipal Court had been dismissed.[81]

57. Meanwhile, on December 19, 2024, Brooks filed this lawsuit, asserting, *inter alia*, civil claims under Section 1983 and the New Mexico Civil Rights Act.[82]

58. Defendants answered on February 6, 2025.[83] In their answer, Defendants admitted virtually all the above facts. Defendants asserted the affirmative defense of qualified immunity.[84]

## III. ARGUMENT

### A. Legal Standard

Pursuant to Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). If the movant makes this showing, the burden then shifts to the nonmovant to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). If the nonmovant "fails to make a showing sufficient to establish the existence of an element," the Federal Rules of Civil Procedure "mandate[ ] the entry of summary judgment." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### B. There is No Genuine Dispute That Defendant Officers Violated Plaintiff's Fourth Amendment Rights.

An investigative detention, also called a *Terry* stop, is "a seizure within the meaning of the Fourth Amendment but, unlike an arrest, it need not be supported by probable cause." *Cortez v.*

[80] Ex. A-10.
[81] Ex. A-11.
[82] Dkt. #1.
[83] Dkt. #4.
[84] Answer at Aff. Def. No. 1.

*McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007) (internal quotations omitted). An officer "can stop and briefly detain a person for investigative purposes if the officer has a ***reasonable suspicion*** supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause." *Id.* (emphasis added). The court views the totality of the circumstances to see whether the detaining officer had a "particularized and objective basis" for suspecting legal wrongdoing. *Id.* at 1123. Conduct that "does not raise an inference of reasonable suspicion….violate[s] [a plaintiff's] Fourth Amendment rights." *Vasquez v. Lewis*, 834 F.3d 1132, 1138 (10th Cir. 2016).

Here, Defendant Officers detained Plaintiff without reasonable suspicion in violation of Plaintiff's constitutional rights. Haynes never identified Brooks as the assailant. In fact, the opposite is true—Haynes identified *Keith Wright* as the assailant. Haynes never provided a physical description of his assailant or approximate age range, let alone one that matched Brooks. The officers did not even ask Haynes for a physical description. Haynes said his assailant was inside a house, not sitting on the sidewalk. Indeed, if the purported assailant had been sitting in plain view on the sidewalk 100 yards away, it stands to reason Haynes would have identified him, yet Haynes did not. When Defendant Officers approached Brooks, Trevino knew the name of the assailant, yet he did not ask Brooks, are you Keith Wright? Defendant Officers did not ask Brooks his name until after they detained him. It also stands to reason that if someone is in the habit of chasing others around the neighborhood with a gun, that when the police come, that person would not sit on the sidewalk in plain view of law enforcement, yet the officers did not appear to consider this in their decision to investigate Brooks.

All these facts show, there is no genuine dispute that Defendant Officers were without reasonable suspicion to detain and investigate Brooks.

The present facts are similar to those in *Romero v. Story*, 672 F.3d 880, 883–84 (10th Cir. 2012). In *Romero*, an apartment resident heard a loud noise emanating from outside his apartment.

*Id.* at 883. He ventured outside to investigate and noticed someone had vandalized his automobile. *Id.* The resident observed a Hispanic male in the same parking lot as his automobile and called law enforcement twice—initially to report the vandalism, and later to report the same Hispanic male he saw earlier in the parking lot had entered Apartment 17. *Id.* Defendant officers responded. *Id.* Based on the resident's "tip" about Apartment 17, defendant officers knocked on the door to that apartment. *Id.* Plaintiff Romero, a Hispanic male, opened the door and took one or two steps outside the apartment. *Id.* Defendants told Romero to take his hands from his pockets. *Id.* Romero complied. *Id.* Romero, not understanding why law enforcement knocked on the door to begin with, turned toward the apartment and proceeded back inside. *Id.* One of the defendant officers grabbed Romero from behind to prevent Romero's entry into the apartment, and another officer performed a leg sweep, causing Romero to hit the ground. *Id.* Defendants handcuffed Romero and placed him under arrest for resisting, evading, or obstructing. *Id.*

Romero brought a civil suit and alleged, *inter alia*, unlawful arrest and that defendant officers did not have reasonable suspicion to perform an investigative detention. *Id.* Defendants moved for summary judgment on their qualified immunity defense, arguing they had reasonable suspicion to detain a Hispanic male in Apartment 17 in connection with the vandalism because of the victim-resident's "identification." *Id.* The district court denied defendants' motion, holding there to be no reasonable suspicion. The court reasoned that all the officers knew when they knocked on Apartment 17 was that a Hispanic male had been seen in the vicinity of a vandalized car, and that the Hispanic male was, at the time the police arrived, located in Apartment No. 17. *Id.* The district court concluded Romero's mere presence at the scene of a past crime did not support a reasonable suspicion Romero had committed the vandalism.

The Tenth Circuit affirmed, echoing the district court's reasoning that the sole fact that a neighbor had seen an Hispanic male in a parking lot where an unwitnessed vandalism had occurred is

not sufficient to support a finding of reasonable suspicion. The court noted that New Mexico's REO statute applies "only where law enforcement officers have reasonable suspicion or probable cause to apprehend or arrest a person *prior to* the flight." *Id.* at 886. "[T]he officers must have had more than a hunch." *Id.* at 888.[85]

The lesson of *Romero* is clear—mere presence of a person near the scene of a past crime does not provide reasonable suspicion for a *Terry* stop. Under this precedent, Brooks wins on the issue of whether his Fourth Amendment rights were violated. If anything, the facts of Brooks' case are more egregious than those in *Romero*. At least in *Romero*, the non-party/victim identified Romero as potentially being the vandal. Here, Haynes never identified Brooks as his assailant. The police leapt to that conclusion themselves (then lied about it afterwards).[86]

For these reasons, Plaintiff respectfully requests summary judgment on the issue of liability under his Section 1983 claim.

### C. Summary Judgment is Proper on Plaintiff's New Mexico Civil Rights Act Claim.

Article 2, § 10 of the New Mexican Constitution states:

> "The people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures, and no warrant to search any place, or seize any person or thing, shall issue without describing the place to be searched, or the persons or things to be seized, nor without a written showing of probable cause, supported by oath or affirmation."

This provision "expresses the fundamental notion that every person in this state is entitled to be free

---

[85] *See also Romero*, 672 F.3d at 888 ("A person of a particular race standing in a parking lot where a crime occurred is not enough to create reasonable suspicion."). Of course, Haynes did not provide the race of his assailant, so the current facts constitute an even more flagrant constitutional violation than in *Romero*.

[86] To the extent Defendant Officers argue they made a mistake of fact about what Haynes said, this is a red herring. While reasonable suspicion may be based on a mistake of fact, such mistake must still be "objectively reasonable." *U.S. v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009); *U.S. v. Herrera*, 444 F.3d 1238, 1246 (10th Cir. 2006); *U.S. v. Walraven*, 892 F.2d 972, 974-75 (10th Cir. 1989). Here, Haynes never identified Plaintiff as the assailant; Haynes never pointed at Plaintiff; Haynes never said his assailant was wearing a white shirt. Defendant Officers' "mistake" was anything but reasonable. It was a result purely of their own hasty judgment.

from unwarranted governmental intrusions, and thus identified a broader protection to individual privacy under the New Mexico Constitution than under the Fourth Amendment." *State v. Jim*, 2022-NMCA-022, ¶ 16 (internal quotations omitted).[87]

Under the New Mexico Constitution, "[i]nvestigatory detention is permissible when there is a reasonable and articulable suspicion that the law is being or has been broken." *State v. Jason L.*, 2000–NMSC–018, ¶ 20 (internal quotation marks and citation omitted). A reasonable suspicion is a "particularized suspicion, based on all the circumstances[,] that a particular individual, the one detained, is breaking, or has broken, the law." *Id.* "Unsupported intuition and inarticulate hunches are not sufficient." *Id.* (internal quotation marks and citation omitted). "Reasonable suspicion must exist at the inception of the seizure. The officer cannot rely on facts which arise as a result of the encounter." *Id.* (internal citation omitted).

Where law enforcement officers violate individuals' state constitutional rights, and where those officers were acting on behalf of a public entity such as the City, the New Mexico Civil Rights Act ("NMCRA") creates a cause of action against that public entity. NMSA § 41-4A-3. The NMCRA expressly waives qualified immunity. *Id.* at § 41-4A-4.

Here, as described *supra* Part III.B, Defendant Officers had no reasonable suspicion to detain Plaintiff. As such, for the same reasons Defendant Officers' conduct was unconstitutional under the U.S. Constitution, their conduct was also unconstitutional under Article 2, Section 10 of the New Mexico Constitution. *Jason L.*, 2000–NMSC–018, ¶ 20; *State v. Garcia*, 2009-NMSC-046, ¶ 46 (no reasonable suspicion where "[d]efendant was merely walking in the vicinity" of a crime, and the detaining officer "did not have a description of [defendant] and had no prior contact with him," and

[87] *See also State v. Garcia*, 2009-NMSC-046, ¶ 31 ("Article II, Section 10 is calibrated slightly differently than the Fourth Amendment."); *id.* (search and seizure provision of the New Mexico Constitution "is a foundation of both personal privacy and the integrity of the criminal justice system, as well as the ultimate regulator of police conduct.").

where defendant "was merely on the same block[,] [and] [i]t was seven o'clock p.m., not an unusual time for people to be walking in the streets."). Because Defendant Officers were acting on behalf of the City, Defendant Officers are liable under the NMCRA. NMSA § 41-4A-3(a).

**D. Defendants' Qualified Immunity Defense Fails.**

Defendants have asserted the affirmative defense of qualified immunity.[88] Where a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff, who must first establish that the defendant violated a constitutional right. *Reynolds v. Powell*, 370 F.3d 1028, 1030 (10th Cir. 2004). Plaintiff must also show at the time of the violation, it was "clearly established" that the misconduct at issue violated the applicable right. *Foote v. Spiegel*, 118 F.3d 1416, 1424 (10th Cir. 1997). "A right is clearly established if it would be clear to a reasonable officer that his conduct was unlawful in the situation." *Maresca v. Bernalillo Cty.*, 804 F.3d 1301, 1308 (10th Cir. 2015) (quotation omitted). Generally, "this means that there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Id.* (quotation omitted); *see also Vasquez*, 834 F.3d at 1138 (describing test for qualified immunity).

In this case, Plaintiff has established that Defendants violated his constitutional rights (*see supra* Part III.B), so the first prong is met. The law regarding *Terry* stops and reasonable suspicion has been clearly established for decades, both at the U.S. Supreme Court and within the Tenth Circuit,[89] and that caselaw is more than sufficient to have advised Defendant Officers their conduct

[88] Answer at Aff. Def. No. 1.

[89] Once police officers make a stop based on reasonable suspicion, the scope of that stop must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio,* 392 U.S. 1, at 20 (1968); *U.S. v. King*, 990 F.2d 1552, 1562 (10th Cir. 1993). "Since police officers should not be required to take unnecessary risks in performing their duties, they are 'authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of [a *Terry*] stop.'" *U.S. v. Perdue,* 8 F.3d 1455, 1462 (10th Cir. 1993) (quoting *U.S. v. Hensley,* 469 U.S. 221, 235 (1985)). However, if police officers' actions exceed what is reasonably necessary under the totality of the circumstances, the stop may only be

was unconstitutional.

Lest there be any doubt, the *Romero* case, discussed *supra* Part III.B, also provided sufficient notice. Under *Romero*, where a person is in the vicinity of where a past crime took place, that presence alone is not grounds for reasonable suspicion. Applying *Romero* here, before detaining Plaintiff, all Defendant Officers knew (at most) was that someone named Keith Wright had chased Haynes with a gun. Defendant Officers knew Brooks was in the general vicinity, but that was it. Defendant Officers had zero basis to suspect Brooks as the assailant. Haynes certainly did not identify Brooks as the assailant—quite the opposite. If anything, the current case is more clearly a violation of the Fourth Amendment than in *Romero*, as, unlike in *Romero*, the eyewitness here (Haynes) did not identify Brooks as the potential wrongdoer.

## IV. CONCLUSION

For the reasons stated above, Plaintiff respectfully requests the Court grant his Motion for Partial Summary Judgment and hold as follows:

- Defendant Officers Thomas, Harris, Smith, Teague, and Trevino are liable under Section 1983 for violating Plaintiff's Fourth Amendment rights under the U.S. Constitution;
- Defendant City of Hobbs is liable for violating Plaintiff's rights under the New Mexico Civil Rights Act and Article Two, Section Ten of the New Mexico Constitution;
- Defendant Officers are precluded from relying on their affirmative defense of qualified immunity as to Counts One and Two of Plaintiff's Complaint.

Plaintiff requests all other relief to which he may be entitled at law or in equity.

justified by probable cause or consent. *Perdue,* 8 F.3d at 1462. "The government has the burden of demonstrating that the seizure 'it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.'" *Id.* (quoting *Florida v. Royer,* 460 U.S. 491, 500 (1983)).

Date: March 25, 2025

Respectfully submitted,

WALDO GUBERNICK
LAW ADVOCATES LLP

/s/ Curtis Waldo
Benjamin Gubernick
Curtis Waldo
New Mexico Bar No. 163604
New Mexico Bar No. 145006
Ben@wglawllp.com
curtis@wglawllp.com
346-394-8056
717 Texas St., Suite 1200
Houston, TX 77002

**CERTIFICATE OF SERVICE**

I hereby certify that on this 25th day of March, 2025, I caused the foregoing document and attachments thereto to be served on all counsel of record in compliance with the Federal Rules of Civil Procedure.

__/s/ Curtis Waldo__________
Curtis Waldo