## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**RONNIE BROOKS,**

**Plaintiff,**                                      No. 2:24-cv-01276-JHR-GBW

v.

**JONAH TREVINO, JOSHUA
THOMAS, T'MADRE HARRIS,
JAMES TEAGUE, TAIWAN SMITH,
and THE CITY OF HOBBS**

**Defendants.**

---

## DEFENDANTS JONAH TREVINO, JOSHUA THOMAS, T'MADRE HARRIS, JAMES TEAGUE, TAIWAN SMITH, AND THE CITY OF HOBBS' RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT AND CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND QUALIFIED IMMUNITY [DOC. 6]

Defendants Jonah Trevino, Joshua Thomas, T'Madre[1] Harris, James Teague, Taiwan[2] Smith, and the City of Hobbs' (collectively "City Defendants") by and through counsel of record MYNATT SPRINGER, P.C. (Blaine T. Mynatt and Haley R. Grant) hereby provide their Response to Plaintiff's Motion for Partial Summary Judgment and Memorandum in Support and Cross-Motion for Partial Summary Judgment and Qualified Immunity [Doc. 6] ("Cross-Motion") as follows.  Undersigned counsel sought Plaintiff's position via email on March 24, 2025, and Plaintiff opposes the relief requested herein.

### INTRODUCTION

---

[1] Ofc. Harris' first name is misspelled in the Complaint [Doc. 1].  Ofc. Harris' first name is spelled "T'Mardre."

[2] Ofc. Smith's first name is misspelled in the Complaint [Doc. 1].  Ofc. Smith's first name is spelled "Tiawan."

Plaintiff's Motion makes much of a reasonable misunderstanding as to how reporting party Willie Haynes appeared to implicate Plaintiff as his aggressor. When Hobbs Police Department ("HPD") officers spoke with Mr. Haynes, he pointed down the street toward his aggressor's vehicle while saying "His name is Keith Wright." At the time, Plaintiff was the only male sitting where Mr. Haynes indicated as he named Mr. Wright. Mr. Haynes did not simply name a subject who threatened to assault him, he named a subject who chased him down in his vehicle with a gun until Haynes was able to hide himself and report to officers.

Plaintiff argues that the officers lacked reasonable suspicion to believe he committed aggravated assault with a deadly weapon, because Mr. Haynes did not provide any physical description of Mr. Wright before officers detained Plaintiff while generally pointing down the street. [Doc. 6, pg. 4, 12]. This argument is immaterial, because officers did not act on a physical description of Mr. Wright but on the reasonable misunderstanding that Mr. Haynes had just pointed Wright out to the officers.

The officers' mistake was reasonable under circumstances indicating that an armed assailant was only down the street from his vehicle after a terrifying chase. The officers reasonably and quickly acted to detain Plaintiff rather than risk the possibility that Plaintiff was armed, dangerous, and willing to shoot Mr. Haynes in a residential neighborhood on a Saturday morning as Mr. Wright threatened minutes earlier. In short, the officers held valid reasonable suspicion that Plaintiff committed aggravated assault with a deadly weapon sufficient to detain him until they could further investigate.

When officers approached Plaintiff to detain him, Plaintiff refused to yield and forcefully resisted officers until he was tased not once, but twice, as officers struggled to handcuff him.

Plaintiff's resistance created the probable cause supporting his arrest even if officers later determine he was not the implicated in the gun assault.

The Motion does not consider the gravity of the circumstances officers found themselves in nor the law giving deference to officers in situations like these.  [Doc. 6].  The law allows for reasonable mistakes of fact that do not disturb reasonable suspicion to detain a subject.  Were this the case, the doctrine of reasonable suspicion would not exit, and officers could be liable for any mistake of fact under any circumstances.  The law does not require officers to conduct flawless investigations and does not dictate exactly how an investigation must be conduct – only that it must be reasonable.

As is true of Fourth Amendment or Article II, Section 10 analyses under the United States and New Mexico constitutions, the Court must examine the totality of the facts which do not support Plaintiff's request for summary judgment much less a waiver of qualified immunity.  On the contrary, the undisputed material facts entitle City Defendants to qualified immunity and summary judgment with valid reasonable suspicion, probable cause, and a balanced intrusion upon Plaintiff's liberty [Doc. 1, pg. 9, ¶¶ 68, 71 – 76].

In this Cross-Motion, City Defendants do not merely assert that some dispute of material facts precludes summary judgment for Plaintiff.  Rather, the facts Plaintiff rely on are either immaterial and disputed or material and undisputed but do not carry his arguments.  [Doc. 6].  Rather, these material facts along with the additional material facts in this Cross-Motion support City Defendants' entitlement to qualified immunity and summary judgment.  Therefore, the Court must deny Plaintiff's Motion and enter qualified immunity and summary judgment for City Defendants against Counts I and II.

**RESPONSE TO PLAINTIFF'S ALLEGED UNDISPUTED MATERIAL FACTS[3]**

1.     City Defendants partially dispute PSMF Paragraph 2 which is also partially contradicted by PSMF Paragraph 8.  *See* Fed. R. Civ. P. 56(a), (c)(1)(B).  Ofc. Harris initially responded to Plaintiff's location, not Mr. Haynes' location.  [Doc. 6-1, Ex. A-6, Harris, 00:00]; [Ex. 7, Harris Declaration, ¶¶ 5-6].

2.     City Defendants do not dispute PSMF Paragraphs 3, 4, and 5, but these paragraphs refer to the wrong timestamps.  [Doc. 6-1, Ex. A-1, Van Zandt, 00:00, 00:15].

3.     City Defendants partially dispute PSMF Paragraph 6 as unsupported by record evidence.  *See* Fed. R. Civ. P. 56(a), (c)(1)(B).  Insofar as Plaintiff alleges Mr. Haynes "*said the person who assaulted him* was "at that house," Haynes was actually describing Mr. Wright's vehicle as "*that black car*, right there *in front of the, right there at the house*." Mr. Haynes later advised that officers arrested the wrong person, explaining that Mr. Wright lives "in that house," but this statement is not material to why the officers detained or arrested Plaintiff since this report came after the arrest.  [Doc. 6-1, Ex. A-1, Van Zandt, 00:10, 04:30, 06:15]; [Doc. 6-1, Ex. A-2, Teague BWC, 00:05]; [Doc. 6-1, Ex. A-6, Harris, 04:30]; *see United States v. Treto-Haro*, 287 F.3d 1000, 1004 (10th Cir. 2002) (quoting *Adams v. Williams*, 407 U.S. 143, 146 (1972) ("[A] brief stop of a suspicious individual in order to determine his identity or to maintain the status quo momentarily while obtaining more information, *may be most reasonable in light of the facts known to the officer at the time*.") (emphasis added)).

4.     City Defendants partially dispute PSMF Paragraph 7 as unsupported by record evidence and containing immaterial facts. *See* Fed. R. Civ. P. 56(a), (c)(1)(B).  Mr. Haynes pointed

---

[3] In this Response, City Defendants refer to each of Plaintiff's numbered Statement of Undisputed Material Facts as "PSMF ¶ _."

toward houses west down the street in Plaintiff's general direction about 100 yards away, but the actual pointing is not captured by video. Instead, video shows Ofc. Van Zandt looked down the street in the direction Mr. Haynes pointed. [Doc. 6-1, Ex. A-1, Van Zandt, 00:10]; [Doc. 6-1, Ex. A-2, Teague BWC, 00:10]; [Doc. 6-1, A-4, Trevino, 00:10]. From 100 yards away, it would be very difficult to determine exactly where Mr. Haynes' finger was pointed nor is there footage definitively showing this. [Doc. 6, PSMF ¶ 6]. However, the officers reasonably inferred that Mr. Haynes was pointing toward Plaintiff. *See infra* [City Defendants' Additional Undisputed Material Facts, ¶¶ 3-8].

When Haynes identified a black car not in view from where the initial responding officers stood, Ofc. Van Zandt and Ofc. Teague figured Mr. Haynes was referring to a dark purple Dodge Challenger parked in front of 1403 East White just east of a suburban parked in front of 1401 East White just west of 1403 East White. *See infra* [City Defendants' Additional Undisputed Material Facts, ¶¶ 3-8]. While Mr. Haynes went on to claim the vehicle was blue, he said it was the vehicle parked *in front of the house* which only implicated the Challenger. *See infra* [City Defendants' Additional Undisputed Material Facts, ¶¶ 16-17]. Plaintiff also refers to an immaterial portion of Ofc. Van Zandt's body worn camera [Doc. 6, pg. 4, n. 12-13] captured after Plaintiff had already been arrested. [Doc. 6-1, Ex. A-1, Van Zandt, 09:10]; *see infra* [City Defendants' Additional Undisputed Material Facts, ¶¶ 3-8]; *Treto-Haro*, 287 F.3d at 1004.

5. City Defendants partially dispute PSMF Paragraph 8. *See* Fed. R. Civ. P. 56(a), (c)(1)(B). Sgt. Thomas was not within earshot of Mr. Haynes until after Ofc. Smith and Ofc. Trevino left to detain Plaintiff. [Doc. 6-1, Ex. A-2, Teague BWC, 00:25]; [Doc. 6-1, A-3, Thomas, 00:25, 00:50]; [Ex. 8, Thomas Declaration, ¶¶ 7-9]. Ofc. Trevino approached after Mr. Haynes had already begun making the statement leading officers to Plaintiff and could not understand the

rest of what he said.  [Doc. 6-1, Ex. A-4, Trevino, 00:05]; [Ex. 5, Trevino Declaration, ¶ 6].  Ofc. Harris also did not initially respond to Mr. Haynes' location and neither Harris nor Sgt. Thomas heard the details of what led Ofc. Teague to believe Plaintiff was the subject until after the incident. [Doc. 6-1, Ex. A-6, Harris, 00:00]; [Ex. 7, Harris Declaration, ¶¶ 5-6]; [Ex. 8, Thomas Declaration, ¶ 9]; *see Treto-Haro*, 287 F.3d at 1004.

6.    City Defendants do not dispute PSMF Paragraph 9, but it is immaterial.  *See* Fed. R. Civ. P. 56(a), (c)(1).  *See infra* [City Defendants' Additional Undisputed Material Facts, ¶¶ 3-8]; *Bustillos v. City of Artesia*, 98 F.4th 1022, 1030 (10th Cir. 2024) (citing *United States v. Pena-Montes*, 589 F.3d 1048, 1052 (10th Cir. 2009) (""A reasonable mistake of fact may support reasonable suspicion. [Courts] may weigh objectively reasonable mistakes of fact made by the officer in favor of reasonable suspicion."); *Cronick v. Pryor*, 99 F.4th 1262, 1272 (10th Cir. 2024) (An officer may "conduct a pat-down search (or frisk) if he or she harbors an articulable and reasonable suspicion that the person is armed and dangerous."); *United States v. McHugh*, 639 F.3d 1250, 1256 (10th Cir. 2011) ("[R]easonable suspicion may exist even if it is more likely than not that the individual is not involved in any illegality. All reasonable suspicion requires is 'some minimal level of objective justification.'") (internal quotations omitted); *Armijo v. Peterson*, 601 F.3d 1065, 1072 (10th Cir. 2010) (Reasonableness is based "upon what the officers reasonably believed at the time.  It does not matter that, in retrospect, information provided to the officers was wrong, and that [a subject] had nothing to do with the threats."); *State v. Simpson*, 388 P.3d 277, 280 (N.M. Ct. App. 2016) (internal quotations omitted) (Reasonable suspicion exists when "the officer is aware of specific articulable facts, together with rational inferences from those facts, that, when judged objectively, would lead a reasonable person to believe criminal activity occurred or was occurring."); *State v. Aguilar*, 488 P.3d 698, 703, 704 (N.M. Ct. App. 2021) ("Reasonable

suspicion is a commonsense, nontechnical conception, which requires that officers articulate a reason, beyond a mere hunch, for their belief that an individual has committed a criminal act." When an officer is "mistaken as to the underlying facts, that mistake of fact does not undercut his objective grounds for reasonable suspicion."); *State v. Olson*, 285 P.3d 1066, 1069 (N.M. 2012) ("Reasonable suspicion is viewed from the perspective of what the officer *knew* at the time the officer detained a suspect.").

7.      City Defendants do not dispute PSMF Paragraph 10, but it is immaterial.  Ofc. Teague reasonably inferred that Mr. Haynes identified Plaintiff by directly pointing him out.  [City Defendants' Additional Undisputed Material Facts, ¶¶ 3-8]; *see* Fed. R. Civ. P. 56(a), (c)(1); *see generally Koch v. Del City*, 660 F.3d 1228, 1240 (10th Cir. 2011) ("[P]olice officers may not ignore easily accessible evidence and thereby delegate their duty to investigate [].").  The officers were still conducting their investigation which included interviewing Plaintiff to determine whether probable cause existed.  *See Baptiste v. J.C. Penny Co.*, 147 F.3d 1252, 1259 (10th Cir. 1998) (Probable cause "requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of a warrantless arrest and detention.") (quoting *Romero v. Fay*, 45 F.3d 1476-1477, 1477 n. 2 (10th Cir. 1995)).

8.      City Defendants do not dispute PSMF Paragraph 11, but it partially cites to the wrong timestamps and is immaterial.  *See* Fed. R. Civ. P. 56(a), (c)(1).  Plaintiff's reference to Ofc. Van Zandt's footage is after Plaintiff had already been arrested.  [Doc. 6-1, Ex. A-1, Van Zandt, 09:10]; *see Armijo*, 601 F.3d at 1072; *Olson*, 285 P.3d at 1069.

9.      City Defendants partially dispute PSMF Paragraph 12.  *See* Fed. R. Civ. P. 56(a), (c)(1).  At no point was Plaintiff sitting on a sidewalk, Ofc. Teague only told Sgt. Thomas that Mr.

Haynes identified the assailant as a guy in a white shirt sitting in front of a Dodge Challenger. [Doc. 6-1, Ex. A-2, Teague BWC, 00:25].

10.     City Defendants do not dispute PSMF Paragraph 13, but it is partially immaterial and misleading on non-material grounds.  *See infra* [City Defendants' Additional Undisputed Material Facts, ¶¶ 3-8]; Fed. R. Civ. P. 56(a), (c)(1).

11.     City Defendants do not dispute PSMF Paragraphs 14 or 15, but it cites the wrong timestamps.  [Doc. 6-1, Ex. A-2, Teague BWC, 00:20]; [Doc. 6-1, Ex. A-3, Thomas, 00:25].

12.     City Defendants partially dispute PSMF Paragraph 16 as misleading.  *See* Fed. R. Civ. P. 56(a), (c)(1).  City Defendants dispute that Mr. Haynes said nothing further to identify Mr. Wright, because Ofc. Van Zandt and Sgt. Thomas remained with Haynes who continued trying to point out the vehicle Wright was driving at the time.  *See infra* [City Defendants' Additional Undisputed Material Facts, ¶ 15-17].   After the arrest, Mr. Haynes also advised that Mr. Wright was an older bald man in his 60s and was not an older man in the area wearing red.  [Doc. 6-1, Ex. A-1, Van Zandt, 05:10, 06:10, 06:15, 6:30, 07:05].

13.     City Defendants do not dispute PSMF Paragraphs 17 or 18, but they cite the wrong timestamps.  [Doc. 6-1, Ex. A-4, Trevino, 01:25]; [Doc. 6-1, Ex. A-6, Harris, 00:00].

14.     City Defendants partially dispute PSMF Paragraph 20, but the dispute is immaterial. *See* Fed. R. Civ. P. 56(a), (c)(1).  Ofc. Trevino did not know Keith Wright's name.  [Doc. 6-1, Ex. A-3, Trevino, 00:05]; [Ex. 5, Trevino Declaration, ¶ 6].

15.     City Defendants partially dispute PSMF Paragraph 21.  *See* Fed. R. Civ. P. 56(a), (c)(1).  Whether Ofc. Smith's statement that Plaintiff had been accused of pointing a gun at someone wrong is immaterial here given that he did not hear Mr. Haynes' report and the

reasonableness of Ofc. Teague's misstatement. *See infra* [City Defendants Additional Undisputed Material Facts, ¶¶ 3-8].

16.    City Defendants do not dispute PSMF Paragraph 22, but it identifies the wrong timestamps. [Doc. 6-1, Ex. A-4, Trevino, 01:45]; [Doc. 6-1, Ex. A-6, Harris, 00:10].

17.    City Defendants partially dispute PSMF Paragraph 23, and it is immaterial and cites to the wrong record evidence. [Doc. 6-1, Ex. A-4, Trevino, 02:20]; [Doc. 6-1, Ex. A-6, Harris, 00:40]; Fed. R. Civ. P. 56(a), (c)(1). Plaintiff agreed to stand up and did so on his own power, and how the officers perceived Plaintiff or ignored him is not within his personal knowledge. *See* Fed. R. Evid. 701(a); *Sanchez v. Guzman*, 105 F.4th 1285, 1297 n. 6 (10th Cir. 2024) ("[T]he district court was *required* to resolve any disputes of fact in the light most favorable to the plaintiff unless "blatantly contradicted" by the video evidence [].") (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). Regardless, PSMF is immaterial, because reasonable suspicion allowed reasonable force to frisk Plaintiff for weapons. *See id*.

18.    City Defendants do not dispute PSMF Paragraph 24, but it cites to the wrong timestamps. [Doc. 6-1, Ex. A-4, Trevino, 02:15]; [Doc. 6-1, Ex. A-6, Harris, 00:35].

19.    City Defendants do not dispute PSMF Paragraph 25, but it is immaterial. *See* Fed. R. Civ. P. 56(a), (c)(1). Neither Ofc. Trevino, Ofc. Harris, nor Ofc. Smith heard Mr. Haynes' report concerning who Keith Wright was. [Doc. 6-1, Ex. A-4, Trevino, 00:05]; [Doc. 6-1, Ex. A-6, Harris, 00:00]; [Ex. 5, Trevino Declaration, ¶ 6]; [Ex. 6, Smith Declaration, ¶ 6]; [Ex. 7, Harris Declaration, ¶¶ 5-6]. Even if officers heard this report, there was good reason to doubt a subject implicated in a serious crime would truthfully identify themselves or what happened. [Ex. 6, Smith Declaration, ¶ 10]; [Ex. 7, Harris Declaration, ¶ 9]; *see McHugh*, 639 F.3d at 1256 (On questions of reasonable suspicion, courts "defer to the ability of a trained law enforcement officer

to distinguish between innocent and suspicious actions. [Courts] judge the officer's conduct in light of common sense and ordinary human experience."); *State v. Martinez*, 457 P.3d 254, 259, 260 (N.M. 2020) (Determining Fourth Amendment and Article II, Section 10 reasonable suspicion are the same providing "[t]raining and experience ensure that officers "are uniquely capable both of recognizing the signatures of criminality []." ) (internal quotations).

20.     City Defendants partially dispute PSMF Paragraph 26, and it is immaterial.  *See* Fed. R. Civ. P. 56(a), (c)(1).  The officers did not force Plaintiff to his feet, but doing so is still immaterial.  *See supra* [City Defendants' Additional Undisputed Material Facts, ¶ 20].

21.     City Defendants partially dispute PSMF Paragraphs 27 or 28, but this disputed fact is immaterial.  *See* Fed. R. Civ. P. 56(a), (c)(1).  Video shows the officers did not gang-tackle Plaintiff which is only material to Plaintiff's force-related claims not at issue here.  [Doc. 1, pg. 10 ¶ 73, pg. 11, ¶ 86, pg. 12, ¶¶ 96-99]; [Doc. 6]; [Doc. 6-1, Ex. A-4, Trevino, 02:25]; [Doc. 6-1, Ex. A-6, Harris, 00:45]; *see Sanchez*, 105 F.4th at 1297 n. 6.

22.     City Defendants partially dispute PSMF Paragraph 29, and it is partially immaterial.  *See* Fed. R. Civ. P. 56(a), (c)(1).  Plaintiff was not under control as he shouted and physically resisted.  [Doc. 6-1, Ex. A-4, Trevino, 02:35; [Doc. 6-1, Ex. A-6, Harris, 01:00]; *see Sanchez*, 105 F.4th at 1297 n. 6.  Plaintiff's repeated statements that he had done nothing wrong did not obviate the reasonable suspicion to detain him for aggravated assault with a deadly weapon or the probable cause justifying his arrest for resisting, obstructing or evading an officer once he attempted to flee detention.  [Ex. 6, Smith Declaration, ¶ 11-12, 15]; [Ex. 7, Harris Declaration, ¶¶ 10-11]; *see* N.M. Stat. Ann. § 30-22-1(D) (1981); N.M. Stat. Ann. § 30-3-2 (1963); *see McHugh*, 639 F.3d at 1256.

23.     City Defendants' do not dispute PSMF Paragraph 30, but its footnote 51 misstates City Defendants' Answer at Paragraph 1 and cites the wrong timestamps.  [Doc. 10, ¶ 1]; [Doc. 6-

1, Ex. A-4, Trevino, 02:50]; [Doc. 6-1, Ex. A-6, Harris, 01:25]; *see* Fed. R. Civ. P. 56(a), (c)(1); *Sanchez*, 105 F.4th at 1297 n. 6.  Nowhere in City Defendants' Answer do they admit Plaintiff was tased *three* times, only twice.  [Doc. 10, ¶¶ 1, 32]; [Ex. 9, Berdoza Declaration, ¶ 5, Attach. 1, BN 2446-2454 Taser Log].

24.     City Defendants do not dispute PSMF Paragraph 31, but it is immaterial and cites the wrong timestamps.  [Doc. 6-1, Ex. A-4, Trevino, 02:50]; [Doc. 6-1, Ex. A-6, Harris, 01:25]; *see* Fed. R. Civ. P. 56(a), (c)(1).  *See* N.M. Stat. Ann. § 30-22-1(D) (1981); N.M. Stat. Ann. § 30-3-2 (1963); *see McHugh*, 639 F.3d at 1256.

25.     City Defendants partially dispute the facts in PSMF Paragraph 32, which also cites the wrong evidence and timestamps and includes immaterial facts.  [Doc. 6-1, Ex. A-2, Teague BWC, 02:40, 3:00]; [Doc. 6-1, Ex. A-3, Thomas, 3:35]; *see* Fed. R. Civ. P. 56(a), (c)(1).  Though immaterial in this briefing, City Defendants dispute any implication that Plaintiffs' characterization of the officers' force as "manhandling" was excessive.  [Doc. 6-1, Ex. A-2, Teague BWC, 02:40, 3:00]; [Doc. 6-1, Ex. A-4, Trevino, 03:00]; [Doc. 6-1, Ex. A-6, Harris, 01:35]; *Sanchez*, 105 F.4th at 1297 n. 6.

26.     City Defendants partially dispute PSMF Paragraph 33 which also cites to the wrong timestamps.  Fed. R. Civ. P. 56(a), (c)(1).  Only four officers – Ofc. Teague, Ofc. Trevino, Ofc. Harris, and Ofc. Smith – assisted with detaining Plaintiff.  [Doc. 6-1, Ex. A-2, Teague BWC, 03:25]; [Doc. 6-1, Ex. A-4, Trevino, 03:15]; [Doc. 6-1, Ex. A-6, Harris, 01:35]; *see Sanchez*, 105 F.4th at 1297 n. 6.

27.     City Defendants partially dispute PSMF Paragraph 34 as immaterial and unsupported by record evidence.  *See* Fed. R. Civ. P. 56(a), (c)(1).  The criminal complaint [Doc. 6-1, Ex. A-12] does not describe force at the jail which is immaterial in this briefing.  [Doc. 6].

28.    City Defendants do not dispute PSMF Paragraphs 35 or 36, though these paragraphs cite the wrong timestamps.  [Doc. 6-1, Ex. A-6, Harris, 04:15, 04:30].

29.    City Defendants partially dispute PSMF Paragraph 37 as unsupported by evidence, but this portion of Paragraph 37 is immaterial.  [Doc. 6, n. 59]; Fed. R. Civ. P. 56(a), (c)(1).  Mr. Haynes disclosed that Mr. Wright was still inside the house, but this statement was only made to Ofc. Van Zandt's presence after the arrest.  [Doc. 6-1, Ex. A-1, Van Zandt, 04:30].

30.    City Defendants do not dispute PSMF Paragraph 38, but it cites the wrong timestamp.  [Doc. 6-1, Ex. A-6, Harris, 04:40].

31.    City Defendants dispute PSMF Paragraph 39, and it is unsupported by record evidence.  Fed. R. Civ. P. 56(a), (c)(1).  Plaintiff lacks personal knowledge as to Ofc. Harris' intent.  *See* Fed. R. Evid. 701(a).  Ofc. Harris did not hear Mr. Haynes' report to gaslight Plaintiff. [4] [Doc. 6-1, Ex. A-6, Harris, 00:00]; [Ex. 7, Harris Declaration, ¶¶ 5-6]; *see Sanchez*, 105 F.4th at 1297 n. 6.  This also becomes clearer as Ofc. Harris continued to ask Mr. Haynes for details as to what he reported to the other officers.  [Doc. 6-1, Ex. A-6, Harris, 05:25].

32.    City Defendants partially dispute PSMF Paragraph 43, and it is immaterial.  Fed. R. Civ. P. 56(a), (c)(1).  Mr. Haynes did not describe Plaintiff or Mr. Wright's physical description before Plaintiff's detention but offered sufficient information to reasonably infer Haynes was implicating Plaintiff.  *See infra* [City Defendants' Additional Undisputed Material Facts, ¶ 3-8]; *Bustillos*, 98 F.4th at 1030; *Cronick*, 99 F.4th at 1272; *McHugh*, 639 F.3d at 1256; *Armijo*, 601 F.3d at 1072; *Simpson*, 388 P.3d at 280; *Aguilar*, 488 P.3d at 703, 704; *Olson*, 285 P.3d at 1069.

---

[4]    Merriam-Webster,    Definition    of    gaslighting,    https://www.merriam-webster.com/dictionary/gaslighting (Gaslighting is "the act or practice of grossly misleading someone especially for one's own advantage.").

33.     City Defendants do not dispute PSMF Paragraphs 44 or 45, but they are immaterial and/or unsupported by record evidence.  *See infra* [City Defendants' Additional Undisputed Material Facts, ¶¶ 3-8, 14-17]; [Doc. 6-1, Ex. A-1, Van Zandt, 00:10]; [Doc. 6-1, Ex. A-2, Teague BWC, 00:05]; *see id*.; Fed. R. Civ. P. 56(a), (c)(1).

34.     City Defendants dispute PSMF Paragraphs 46, 47, and 48.  *See* Fed. R. Civ. P. 56(a), (c)(1); [City Defendants' ¶ 33 Response to PSMF ¶¶ 44, 45].   Ofc. Trevino understood what he did about how Mr. Haynes implicated Plaintiff through Ofc. Teague.  [Doc. 6-1, A-2, Teague BWC, 00:35]; [Ex. 5, Trevino Declaration, ¶¶ 6-10]. From this, Ofc. Trevino inferred that Mr. Haynes directly described Plaintiff as Mr. Wright.  [Ex. 5, Trevino Declaration, ¶ 10].  Ofc. Trevino did not learn Plaintiff was not Mr. Wright until after the arrest which he figured was simply Mr. Haynes' retraction of the statement.  [Ex. 5, Trevino Declaration, ¶ 23].  Ofc. Trevino prepared and submitted the incident report and criminal complaint to Sgt. Thomas later that day.  [Ex. 5, Trevino Declaration, ¶¶ 25-26].  Without directly witnessing Mr. Haynes' report to realize the errors in how Ofc. Trevino relayed Mr. Haynes' report, Sgt. Thomas approved, signed, and submitted the criminal complaint.  [Ex. 5, Trevino Declaration, ¶ 26]; [Ex. 8, Thomas Declaration, ¶¶ 25-26].  Sgt. Thomas and Ofc. Trevino prepared and approved an amended complaint given to the Fifth Judicial District Attorney's Office.  [Ex. 5, Trevino Declaration, ¶¶ 31-35]; [Ex. 8, Thomas Declaration, ¶¶ 27-31].  However, the amended complaint was never added to the district court docket.  [Doc. 6, PSUMF ¶ 49].  Nevertheless, even excluding the error, reasonable suspicion and probable cause still supported the charges as provided in the original criminal complaint.  [Ex. 5, Trevino Declaration, ¶¶ 38-39]; [Ex. 8, Thomas Declaration, ¶¶ 33-34]; [Doc. 6-1, Ex. A-12. pg. 30, ([Mr. Haynes] pointed to a male subject that was sitting on the curb down the street and stated it was that male.");  *see Mocek v. City of Albuquerque*, 813 F.3d 912, 937 (10th Cir. 2015)

(finding a "*lack of probable cause must be manifest*" in a criminal complaint that was not the case based on "the complaint as a whole"). The corrected incident report also provided that Mr. Haynes "pointed down the street to a house on White where a male subject was standing. [Mr. Haynes] advised that a male at that house had pointed a firearm at him. [Haynes] advised the male's name was Keith Wright. No other identifiers for [Mr. Wright] so he will not be added to the entities." [Doc. 6-1, A-13, Original Narrative, pg. 3].

       35.    City Defendants partially dispute PSMF Paragraph 52. *See* Fed. R. Civ. P. 56(a), (c)(1). As provided in the order, the Hobbs Municipal Court made its determination based on the lack of physical identifiers for Mr. Wright without identifying or applying controlling case law. [Doc. 6-1, A-8, pg. 3, Order on Motion to Suppress]; *see Bustillos*, 98 F.4th at 1030; *McHugh*, 639 F.3d at 1256; *State v. Arredondo*, 123 N.M. 628, 633 (N.M. Ct. App. 1997) (Article II, Section 10 allows "an officer's reasonable belief that a suspect is armed and dangerous [to] follow from a reasonable suspicion that the suspect has committed, is committing, or will commit an "inherently dangerous crime.") *rev'd on other grounds by State v. Steinzig*, 127 N.M. 752, 987 P.2d 409 (N.M. Ct. App. 1999); *State v. Madsden*, 129 N.M. 251, 254, 5 P.3d 573 (N.M. Ct. App. 2000) (Aggravated assault, or assault with a deadly weapon, is an inherently dangerous crime and a felony."); *State v. Ketelson*, 150 N.M. 137, 145, 257 P.3d 957 (N.M. 2011) ("Concerns for officer safety are undoubtedly legitimate and *weigh heavily in the reasonableness calculus*.") (emphasis added).

       36.    City Defendants do not dispute PSMF Paragraph 53, but it is immaterial. *See* fed. R. Civ. P. 56(a),(c)(1); [City Defendants' ¶ 35 Response to PSMF ¶ 52]; [City Defendants' ¶ 34 Response to PSMF ¶¶ 46-48].

37.     City Defendants do not dispute PSMF Paragraphs 54, 55, and 56, but it is immaterial.  *See* Fed. R. Civ. P. 56(a), (c)(1).  Whether the City appealed the Order on Motion to Suppress is immaterial to Article II, Section 10 and Fourth Amendment reasonable suspicion and probable cause at issue in this briefing.  [Doc. 6, pg. 1-3, 11, 14].

38.     City Defendants do not dispute PSMF Paragraph 57, but it is immaterial.  *See* Fed. R. Civ. P. 56(a), (c)(1).  Plaintiff's lawsuit and when it was filed are immaterial to the briefing. [Doc. 6, pg. 1-3, 11, 14].

39.     City Defendants partially dispute PSMF Paragraph 58, and it is immaterial.  *See* Fed. R. Civ. P. 56(a), (c)(1). City Defendants' Answer specifies exactly which facts were admitted, and the answer date is immaterial.  [Doc. 6, pg. 1-3, 11, 14].

## ADDITIONAL UNDISPUTED MATERIAL FACTS[5]

1.     On August 3, 2024, Hobbs Police Department officers including non-party Officer James Van Zandt and Defendants Officer James Teague, Officer Jonah Trevino, Officer T'Mardre Harris, Officer Tiawan Smith, and Sergeant Joshua Thomas responded to the reporting party's claim that they were being chased with a gun and were hiding.  [Doc. 6, PSMF ¶ 1]; [Ex. A-3 Thomas, 00:14]; [Ex. A-4 Trevino, 00:05]; [Ex. A-6 Harris, 00:00]; [Ex. 2, Teague Declaration, ¶ 4]; [Ex. 5, Trevino Declaration, ¶ 6]; [Ex. 6, Smith Declaration, ¶ 6]; Ex. 7, Harris Declaration, ¶ 5]; Ex. 8 Thomas Declaration, ¶¶ 7, 9].

2.     Ofc. Van Zandt interviewed reporting party Willie Haynes as Ofc. Teague listened and monitored the scene.  [Doc. 6-1, Ex. A-1, Van Zandt, 00:00]; [Doc. 6-1, Ex. A-2, Teague BWC, 00:00]; [Ex. 1, Van Zandt Declaration, ¶ 5]; [Ex. 2, Teague Declaration, ¶ 6].

---

[5] In this Response, City Defendants refer to their own Additional Undisputed Material Facts as ("AUMF").

3.      Ofc. Van Zandt confirmed Mr. Haynes was okay as Haynes pointed down the street west to what Van Zandt and Ofc. Teague thought was a vehicle parked at 1403 East White Street about 100 yards away.[6] [Doc. 6, pg. 4, PSMF ¶ 6]; [Doc. 6-1, A-1, Van Zandt, 00:10]; [Doc. 6-1, Ex. A-3, Teague BWC, 00:05]; [Ex. 1, Van Zandt Declaration, ¶¶ 5, 7]; [Ex. 2, Teague Declaration, ¶¶ 6, 8].

4.      As he pointed down the street to Mr. Wright's vehicle, Mr. Haynes reported that, " [the assailant] was driving that black car, right there in front of that house.  His name is Keith Wright. Where the suburban is, yeah." [Doc. 6-1, A-1, Van Zandt, 00:10]; [Doc. 6-1, Ex. A-2, Teague BWC, 00:05]; [Ex. 1, Van Zandt Declaration, ¶ 8]; [Ex. 2, Teague Declaration, ¶ 8].

5.      Neither of the officers were able to see a suburban in the area or a dark in color car parked in front of any house, but they saw a dark purple Dodge Challenger parked in front of 1403

---

[6] The officers' reports indicate that Plaintiff was sitting in front of 1401 East White Street which was incorrect.  Doc. 6-1, Ex. A-13, pg. 3, 5, 7].  1401 East White is next door and just west of 1403 East White sitting on the west corner of the street.  [Ex. 3, Maps].  Snippets from the officers' body worn camera footage and the enclosed photos taken from Google Maps and MapQuest show the number on the mailbox at 1403 East White and the street as being East White based on photos of the street signs.  [Ex. 3, Maps].  When comparing the body worn camera footage, it is clear that Plaintiff was sitting in front of 1403 East White where the vehicle Mr. Haynes identified Keith Wright as driving during the chase.

The enclosed street view from Google Maps incorrectly identifies 1403 East White as being on the corner of South Douglas and Byers Street when this house is actually at 1401 East White.  [Ex. 3, Maps, pg. 2].  The street signs and posted address numbers in front of these houses makes clear that 1403 East White was the second to last house while 1401 East White was the last house on the corner of East White before the road becomes South Douglas and loops around east.  [Ex. 3, Maps, pg. 2-11].

Plaintiff's location was plainly down the same roadway at the 1403 address marked on the mailbox in front of the house.  City Defendants seek the Court's judicial notice that 1) 1403 East White is the address of the property Plaintiff sat in front of when he was detained and 2) Mr. Haynes made contact with officers at 1506 East White located north across the street and east of 1403 East White or simply that the officers made contact with Mr. Haynes on the same straight stretch of roadway about 300 feet, or 100 yards away.  [Ex. 3, Maps]; *see* Fed. R. Evid. 201(b)(2), (c)(2).

East White.  [Ex. 1, Van Zandt Declaration, ¶¶ 7-10]; [Ex. 2, Teague Declaration, ¶¶ 8-10]; [Ex. 4, View of Vehicles].

      6.      At the time, Plaintiff sat on a retaining wall at the front perimeter of the 1403 East White house.  [Ex. 1, Van Zandt Declaration, ¶ 12]; [Ex. 2, Teague Declaration, ¶ 11]; [Ex. 5, Trevino Declaration, ¶ 7]; [Ex. 6, Smith Declaration, ¶ 8]; [Ex. 7, Harris Declaration, ¶ 6].

      7.      Meanwhile, Ofc. Van Zandt asked Mr. Haynes for clarification, "where the suburban is and that black car?" and Haynes responded "Yeah." [Doc. 6-1, A-1, Van Zandt, 00:20]; [Doc. 6-1, Ex. A-2, Teague BWC, 00:15]; [Ex. 1, Van Zandt Declaration, ¶¶ 7-11]; [Ex. 2, Teague Declaration, ¶¶ 8-10].

      8.      Seeing no black car from where they stood, Ofc. Teague and Ofc. Van Zandt presumed Mr. Haynes was referring to the Dodge Challenger.  [Ex. 1, Van Zandt Declaration, ¶¶ 7-11]; [Ex. 2, Teague Declaration, ¶¶ 8-10]; [Ex. 4, View of Vehicles].

      9.      Mr. Haynes further confirmed that Mr. Wright put a gun on him before saying Wright chased him trying to shoot him "again." [Doc. 6-1, A-1, Van Zandt, 00:20]; [Doc. 6-1, Ex. A-2, Teague BWC, 00:15]; Ex. 1, Van Zandt Declaration, ¶ 15; Ex. 2, Teague Declaration, ¶ 13].

      10.      Since they were dealing with a threat of gun violence in a residential area with the victim and potential aggressor in the same area, Ofc. Teague feared Mr. Wright might recklessly endanger neighbors at home on a Saturday morning.  [Ex. 2, Teague Declaration, ¶¶ 13-18].

      11.      Ofc. Teague was also concerned the situation might escalate into gun violence in a residential area on a Saturday morning given that a potential aggressor was about 100 yards from Mr. Haynes.  Ofc. Teague wanted to ensure Plaintiff did not have any weapons on his person.  [Ex. 2, Teague Declaration, ¶¶ 13-18]; [Doc. 6, pg. 4, PSMF, ¶ 6].

12.     Based on his misunderstanding that Mr. Haynes pointed to Plaintiff as Mr. Wright, Ofc. Teague told Sgt. Thomas that Haynes "was saying that the guy there in the white shirt, sitting in front of the Challenger" was the person who threatened gun violence. [Doc. 6-1, Ex. A-2, Teague BWC, 00:20]; [Doc. 6-1, Ex. A-3 Thomas, 00:25]; [Ex. 2, Teague Declaration, ¶¶ 11-20]; [Ex. 8, Thomas Declaration, ¶¶ 5-8].

13.     Sgt. Thomas and Ofc. Teague told arriving Ofc. Smith and Ofc. Trevino to make contact with the male in the white shirt since Mr. Haynes implicated him as the who pulled a gun on him.  [Doc. 6-1, Ex. A-2, Teague BWC, 00:40]; [Doc. 6-1, Ex. A-3 Thomas, 00:35]; [Doc. 6-1, Ex. A-4, Trevino, 00:35]; [Ex. 2, Teague Declaration, ¶ 20]; [Ex. 5, Trevino Declaration, ¶ 7]; [Ex. 6, Smith Declaration, ¶ 6]; [Ex. 8, Thomas Declaration, ¶¶ 10-12].

14.     As officers made their way to Plaintiff, Mr. Haynes continued speaking with Ofc. Van Zandt telling him "You all need to go down there and get him.  He's been threatening me for a while." [Doc. 6-1, A-1, Van Zandt, 00:50]; [Ex. 1, Van Zandt Declaration, ¶¶ 16, 18].

15.     Ofc. Van Zandt asked for clarification as to whether Mr. Wright's vehicle was a black car since he did not see a black car in the area Mr. Haynes pointed to.  [Doc. 6-1, A-1, Van Zandt, 01:00]; [Doc. 6-1, Ex. A-3 Thomas, 00:55]; [Doc. 6-1, Ex. A-2, Teague BWC, 00:55]; [Ex. 1, Van Zandt Declaration, ¶¶ 19-20]; [Ex. 4, View of Vehicles].

16.     Mr. Haynes responded that Mr. Wright was driving "a *black* car in the front yard right there. That *blue* one, see right there by the white car?" Ofc. Van Zandt asked, "That purple one right there?" Mr. Haynes replied, "The other one that's by that white car, in the yard, parked in the yard." [Doc. 6-1, A-1, Van Zandt, 01:00]; [Doc. 6-1, Ex. A-3 Thomas, 00:55]; [Doc. 6-1, Ex. A-2, Teague BWC, 00:55]; [Ex. 1, Van Zandt Declaration, ¶¶ 19-21]; [Ex. 4, View of Vehicles].

17.     Ofc. Van Zandt figured Mr. Haynes could only be referring to the purple Challenger which was the only dark in color car they could see from 1506 East White.  [Ex. 1, Van Zandt Declaration, ¶¶ 19-22]; [Ex. 4, View of Vehicles].

18.     Meanwhile, Ofc. Smith, Ofc. Trevino, and Ofc. Harris approached Plaintiff explaining that someone claimed he pointed a gun at them as they grabbed his arms to detain him. [Doc. 6-1, Ex. A-4, Trevino, 01:30]; [Doc. 6-1, Ex. A-6, Harris, 00:00]; [Ex. 5, Trevino Declaration, ¶¶ 10-11]; [Ex. 6, Smith Declaration, ¶¶ 8-9]; [Ex. 7, Harris Declaration, ¶ 8].

19.     Plaintiff argued that he "just got there" as he insisted he had not pulled a gun on anyone.  [Doc. 6-1, Ex. A-4, Trevino, 01:45]; [Doc. 6-1, Ex. A-6, Harris, 00:10]; [Ex. 5, Trevino Declaration, ¶ 13]; [Ex. 6, Smith Declaration, ¶ 11]; [Ex. 7, Harris Declaration, ¶ 10].

20.     Ofc. Smith commanded Plaintiff to stand up as Smith and Ofc. Trevino tried to stand him up then released him when Plaintiff resisted but said he would stand up if he could set his phone down.  Ofc. Smith took the phone, set it down, and Ofc. Harris asked for Plaintiff's name, which he said was Ronnie Brooks.  [Doc. 6-1, Ex. A-4, Trevino, 02:05]; [Doc. 6-1, Ex. A-6, Harris, 00:35]; [Ex. 5, Trevino Declaration, ¶¶ 12-14]; [Ex. 6, Smith Declaration, ¶¶ 11-12]; [Ex. 7, Harris Declaration, ¶¶ 10-13].

21.     In Ofc. Smith and Ofc. Harris' experience, accused subjects often lie about who they are or what happened following a report.  [Ex. 6, Smith Declaration, ¶ 10]; [Ex. 7, Harris Declaration, ¶ 9].

22.     Plaintiff stood up as he called out for, "Uncle Keith!" as he continued to say he had not done anything.  Unexpectedly as Plaintiff stood up saying he would comply, he tried to sprint away from the officers.  [Doc. 6-1, Ex. A-4, Trevino, 02:15]; [Doc. 6-1, Ex. A-6, Harris, 00:40];

[Ex. 5, Trevino Declaration, ¶ 15]; [Ex. 6, Smith Declaration, ¶¶ 13-14]; [Ex. 7, Harris Declaration, ¶ 14].

23.     Ofc. Smith grabbed Plaintiff's left hand allowing the other officers to grab hold of Plaintiff as they wrestled him to the ground and onto his back.  [Doc. 6-1, Ex. A-4, Trevino, 02:20]; [Doc. 6-1, Ex. A-6, Harris, 00:45]; [Ex. 5, Trevino Declaration, ¶ 16]; [Ex. 6, Smith Declaration, ¶ 14]; [Ex. 7, Harris Declaration, ¶ 15].

24.     Meanwhile, Plaintiff lay on his back before rotating to his right side with his right-arm underneath him trying to get up as officers struggled to gain control.  [Doc. 6-1, Ex. A-4, Trevino, 02:25]; [Doc. 6-1, Ex. A-6, Harris, 00:55]; [Ex. 6, Smith Declaration, ¶ 15]; [Ex. 7, Harris Declaration, ¶ 16].

25.     Plaintiff was able to get on his hands and knees as he called out "Uncle Keith!"  as Ofc. Harris repeatedly told Plaintiff to turn around as officers tried to keep him from getting up.  [Doc. 6-1, Ex. A-4, Trevino, 02:35]; [Doc. 6-1, Ex. A-6, Harris, 01:00]; [Ex. 5, Trevino Declaration, ¶ 17]; [Ex. 6, Smith Declaration, ¶ 16]; [Ex. 7, Harris Declaration, ¶ 17].

26.     With Ofc. Harris' taser drawn, he warned Plaintiff to turn around or he was going to get tased as Plaintiff continued to resist.  [Doc. 6-1, Ex. A-4, Trevino, 02:45]; [Doc. 6-1, Ex. A-6, Harris, 01:05]; [Ex. 5, Trevino Declaration, ¶ 19]; [Ex. 6, Smith Declaration, ¶ 17]; [Ex. 7, Harris Declaration, ¶¶ 17-18].

27.     The officers continued to struggle to keep Plaintiff from trying to stand as commands to comply continued while a group of women shouted at the officers.  [Doc. 6-1, Ex. A-4, Trevino, 02:45]; [Doc. 6-1, Ex. A-6, Harris, 01:10]; [Ex. 5, Trevino Declaration, ¶ 18]; [Ex. 6, Smith Declaration, ¶¶ 17-18]; [Ex. 7, Harris Declaration, ¶¶ 19-21].

28.     Plaintiff forced himself up onto his hands and knees again then up to his feet as Ofc. Harris drive-stunned him in the back and Ofc. Teague arrived to assist.  [Doc. 6-1, Ex. A-2, Teague BWC, 02:55]; [Doc. 6-1, Ex. A-4, Trevino, 02:50]; [Doc. 6-1, Ex. A-6, Harris, 01:15]; [Ex. 2, Teague Declaration, ¶¶ 23-24]; [Ex. 5, Trevino Declaration, ¶¶ 18, 20]; [Ex. 6, Smith Declaration, ¶ 19]; [Ex. 7, Harris Declaration, ¶¶ 19-23]; [Ex. 9, Berdoza Declaration, Attach. 1, BN 2446-2454 Taser Log].

29.     Plaintiff fell back onto the ground but got to his hands and knees again as Ofc. Smith and Ofc. Harris held Plaintiff's back, Ofc. Trevino tried to grab Plaintiff's left arm, and Ofc. Teague grabbed his right arm.  [Doc. 6-1, Ex. A-2, Teague BWC, 03:00]; [Doc. 6-1, Ex. A-4, Trevino, 02:55]; [Doc. 6-1, Ex. A-6, Harris, 01:25]; [Ex. 2, Teague Declaration, ¶ 25]; [Ex. 5, Trevino Declaration, ¶ 19]; [Ex. 6, Smith Declaration, ¶¶ 20-21]; [Ex. 7, Harris Declaration, ¶ 23].

30.     Plaintiff tried to stand up again when Ofc. Teague told Ofc. Harris to drive-stun Plaintiff.  Ofc. Harris drive-stunned Plaintiff once in the middle back for a split second.  [Doc. 6-1, Ex. A-2, Teague BWC, 03:00]; [Doc. 6-1, Ex. A-4, Trevino, 02:55]; [Doc. 6-1, Ex. A-6, Harris, 01:25]; [Ex. 2, Teague Declaration, ¶¶ 24-25]; [Ex. 5, Trevino Declaration, ¶¶ 19-20]; [Ex. 6, Smith Declaration, ¶¶ 20-23]; [Ex. 7, Harris Declaration, ¶ 24]; [Ex. 9, Berdoza Declaration, Attach. 1, BN 2446-2454 Taser Log].

31.     Plaintiff fell onto his back as Ofc. Harris commanded him to turn around, and Plaintiff yelled, "okay!" but continued to resist officers' attempts to turn him over and maneuvered himself into a sitting position.  [Doc. 6-1, Ex. A-2, Teague BWC, 03:05]; [Doc. 6-1, Ex. A-4, Trevino, 02:55]; [Doc. 6-1, Ex. A-6, Harris, 01:25]; [Ex. 2, Teague Declaration, ¶ 27]; [Ex. 5, Trevino Declaration, ¶ 19]; [Ex. 6, Smith Declaration, ¶¶ 20-23]; [Ex. 7, Harris Declaration, ¶ 25].

32.     With the combined assistance of Ofc. Teague, Ofc. Trevino, Ofc. Smith, and Ofc. Harris, Teague instructed against any further tasing, and the officers were able to use hands-on force to handcuff Plaintiff. [Doc. 6-1, Ex. A-2, Teague BWC, 03:10]; [Doc. 6-1, Ex. A-4, Trevino, 03:05]; [Doc. 6-1, Ex. A-6, Harris, 01:30]; [Ex. 2, Teague Declaration, ¶¶ 25-30]; [Ex. 5, Trevino Declaration, ¶ 21]; [Ex. 6, Smith Declaration, ¶ 24]; [Ex. 7, Harris Declaration, ¶¶ 25-26].

33.     The officers stood Plaintiff up and Sgt. Thomas escorted him to his police unit. [Doc. 6-1, Ex. A-2, Teague BWC, 03:55]; [Doc. 6-1, Ex. A-3, Thomas, 03:35]; [Doc. 6-1, Ex. A-4, Trevino, 03:40]; [Doc. 6-1, Ex. A-6, Harris, 02:05]; [Ex. 2, Teague Declaration, ¶ 32]; [Ex. 5, Trevino Declaration, ¶ 22]; [Ex. 8, Thomas Declaration, ¶ 18].

34.     Afterwards, Ofc. Smith went to speak with one of women who were shouting at officers. Ofc. Smith relayed that officers suspected Plaintiff of pointing a gun at someone, and they detained him until they could figure it out. Since Plaintiff tried to run, that was why he ended up on the ground. [Doc. 6-1, Ex. A-2, Teague BWC, 04:25]; [Doc. 6-1, Ex. A-6, Harris, 02:35].

35.     Sgt. Thomas and Ofc. Harris also spoke with additional witnesses to explain what happened. Sgt. Thomas reported that officers responded to a reporting party down the street who pointed at Plaintiff as the person who threatened him with a gun. Sgt. Thomas said this was why the officers approached Plaintiff to question him. [Doc. 6-1, Ex. A-3, Thomas, 21:05]; [Doc. 6-1, Ex. A-6, Harris, 19:25].

36.     Sgt. Thomas further explained that officers had to frisk Plaintiff to ensure he did not have a gun which might further escalate the situation. Ofc. Harris added that Plaintiff was detained before his arrest, and he would not have been arrested had he not tried to run from officers. [Doc. 6-1, Ex. A-3, Thomas, 19:50]; [Doc. 6-1, Ex. A-6, Harris, 19:25].

37.     As Plaintiff sat in Sgt. Thomas' unit, he again identified himself as Ronnie Brooks to Sgt. Thomas while reporting that his uncle was Keith Wright and denied any involvement in Mr. Haynes' assault.  Sgt. Thomas told Plaintiff that Mr. Haynes pointed at him identifying him as the aggressor with the gun later saying Haynes identified Plaintiff as the guy in the white T-shirt.  [Doc. 6-1, Ex. A-3, Thomas, 05:40, 06:20, 25:45].

38.     Plaintiff denied this was true, and Sgt. Thomas began probing why Mr. Haynes would have identified Plaintiff as Mr. Wright.  Plaintiff replied that he had no idea.  [Doc. 6-1, Ex. A-3, Thomas, 06:30, 25:40].

39.     Ofc. Harris and Ofc. Teague also approached Mr. Haynes and Ofc. Van Zandt to follow up for more details.  Ofc. Van Zandt confirmed with Mr. Haynes that Plaintiff was not Mr. Wright, an older gentleman in his 60s while also denying that Wright was a bald elderly gentleman wearing a red shirt walking around the area.  [Doc. 6-1, Ex. A-1, Van Zandt, 04:10, 06:10]; [Doc. 6-1, Ex. A-2, Teague BWC, 08:10]; [Doc. 6-1, Ex. A-6, Harris, 04:30]; [Ex. 1, Van Zandt Declaration, ¶¶ 27-31]; [Ex. 2, Teague Declaration, ¶¶ 34-36]; [Ex. 7, Harris Declaration, ¶¶ 27-28].

40.     Ofc. Harris claimed Plaintiff self-identified as Mr. Wright which Ofc. Van Zandt and Mr. Haynes reported could not be true.  Ofc. Teague radioed Ofc. Harris advising that Plaintiff was neither Keith Wright, Sr. nor Keith Wright, Jr.  [Doc. 6-1, Ex. A-1, Van Zandt, 06:20]; [Doc. 6-1, Ex. A-2, Teague BWC, 06:40]; [Doc. 6-1, Ex. A-6, Harris, 04:50]; [Ex. 1, Van Zandt Declaration, ¶ 27]; [Ex. 2, Teague Declaration, ¶ 33]; [Ex. 7, Harris Declaration, ¶ 27].

41.     After following up with Ofc. Van Zandt and Mr. Haynes, Ofc. Teague told Sgt. Thomas that Haynes changed his statement.  Ofc. Teague provided that Mr. Haynes pointed Plaintiff out as Mr. Wright with Teague insisting, "Yes, in the very beginning, it's 100 percent he

said, "guy sitting on the sidewalk with the white t-shirt." [Doc. 6-1, Ex. A-2, Teague BWC, 10:50]; [Doc. 6-1, Ex. A-3, Thomas, 10:50]; [Ex. 8, Thomas Declaration, ¶ 24].

42.     The officers concluded they had reasonable suspicion but not probable cause to arrest Plaintiff for aggravated assault with a deadly weapon while also finding probable cause supported his arrest for resisting, evading or obstructing an officer based on his resistance to his detention.  [Ex. 1, Van Zandt Declaration, ¶ 32]; [Ex. 2, Teague Declaration, ¶¶ 37, 39]; [Ex. 5, Trevino Declaration, ¶ 38]; [Ex. 6, Smith Declaration, ¶ 26]; [Ex. 7, Harris Declaration, ¶ 29] [Ex. 8, Thomas Declaration, ¶¶ 33-34].

43.     Sgt. Thomas transported Plaintiff for confinement and Ofc. Trevino submitted a criminal complaint charging Plaintiff with resisting, evading or obstructing an officer.  [Ex. 5, Trevino Declaration, ¶ 22]; [Ex. 8, Thomas Declaration, ¶ 23].

## LEGAL STANDARDS

A law enforcement officer's qualified immunity from suit is lost if they face the burdens of litigation, so courts must view summary judgment in the context of qualified immunity differently. *Lee v. Tucker*, 904 F.3d 1145, 1152 (10th Cir. 2018).  Qualified immunity ""protects public employees from liability [] and from the burdens of litigation" arising from their exercise of discretion." *Johnson v. City of Cheyenne*, 99 F.4th 1206, 1216 (10th Cir. 2024).  An officer's immunity shields them from liability "when [they] make[] a decision that, even if constitutionally deficient, reasonably apprehends the law governing the circumstances [they] confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001)) (Qualified immunity protects "officers from the sometimes 'hazy border between excessive and acceptable force.'"); *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (quoting *White v. Pauly*, 580 U.S. 73, 78-79 (2017) ("Qualified immunity attaches when an official's conduct does not

violate clearly established statutory or constitutional rights of which a reasonable prudent person would have known.")).

"[O]nly *after* plaintiff crosses the legal hurdle comprised of his or her two-part burden [], that courts should be concerned with the *true* factual landscape – as opposed to the factual landscape as plaintiff would have it." *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1326 (10th Cir. 2009).  This Court "must determine (1) "whether the plaintiff has alleged facts to demonstrate a violation of a constitutional right," and (2) "whether the right at issue was 'clearly established' at the time."" *Emmett v. Armstrong*, 973 F.3d 1127, 1132 (10th Cir. 2020) (quoting *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1208 (10th Cir. 2017)). "Ordinarily, to establish that a proposition of law is clearly established in this circuit, the plaintiff must rely on an on-point precedent of this court or the Supreme Court or a clear consensus of a significant number of fellow circuit courts." *Leiser v. Moore*, 903 F.3d 1137, 1140 (10th Cir. 2018) (internal citations omitted).

 "It is not enough that the rule is suggested by then-existing precedent.  The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). ""The dispositive question is 'whether the violative nature of the *particular* conduct is clearly established.'"" *Ullery v. Bradley*, 949 F.3d 1282, 1291 (10th Cir. 2020) (quoting *Mullenix v. Luna*, 557 U.S. 7, 12 (2015)). "This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix*, 557 U.S. at 12 (internal quotations omitted).

However, "[g]eneral statements of the law are not inherently incapable of giving fair and clear warning to officers, but in the light of pre-existing law the unlawfulness must be apparent." *White*, 580 U.S. at 79-80; *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) ("We have repeatedly told courts not to define clearly established law at too high a level of generality.").  "Of course,

there can be the rare "obvious case," where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Wesby*, 583 U.S. at 64 (quoting *Brosseau*, 543 U.S. at 199).

A district court's grant of summary judgment is proper when a movant shows they are entitled to judgment as a matter of law based on undisputed material facts. Fed. R. Civ. P. 56(a). "The movant bears the initial burden of proving that no genuine issues of material fact exist for trial." *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010). "[T]he pleadings, the discovery and disclosure materials on file, and any affidavits [must] show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). Courts "view the evidence and make inferences in the light most favorable to the nonmovant." *Nanho-Lopez*, 625 F.3dat 1283.

A fact is "material" if it might affect a case's resolution under applicable law, and a dispute of material fact is "genuine" if a reasonable jury could not return a verdict for the nonmoving party accepting these facts. *Forth v. Laramie Cty. Sch. Dist. No. 1*, 85 F.4th 1044, 1052 (10th Cir. 2023). District courts must refrain from weighing evidence or assessing the truth of a matter and may only determine whether a genuine fact issue exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). On the record before the Court, the undisputed material facts do not support Plaintiff's entitlement to summary judgment. On the contrary, the undisputed material facts support City Defendants' entitlement to summary judgment and qualified immunity.

## ARGUMENT

I.    **Reasonable suspicion for aggravated assault with a deadly weapon supported Plaintiff's detention until he tried to flee which supplied probable cause for resisting, evading or obstructing an officer. Thus, the Court must deny Plaintiff summary judgment against the Article II, Section 10 and Fourth Amendment claims and enter judgment for City Defendants.**

Mr. Haynes' report and his reasonably misunderstood indications that Plaintiff was his aggressor supported reasonable suspicion to detain and frisk Plaintiff until the officers could safely ensure the continuation of the investigation. [AUMF ¶¶ 2-8]. The dangerous implications behind felony aggravated assault with a deadly weapon further justified the officers' detetnion. [AUMF ¶¶ 10-11]. Once Plaintiff attempted to flee and physically resisted officers, probable cause justified his arrest for resisting, evading or obstructing an officer. [AUMF ¶¶ 18-32].

The officers' subjective statements describing how they determined reasonable suspicion are immaterial, because an objectively reasonable officer could have done the same with what the officers knew. [AUMF ¶¶ 13, 35, 37, 41]; [Doc. 6-1, Ex. A-12, pg. 30]; [Doc. 6-1, Ex. A-13, pg. 40]. Plaintiff's attempt to cast the officers as having some animus against him is further unsupportable on this objective evidence. [AUMF ¶¶ 34-42]; [Doc. 6, pg. 12, 15-16]. Rather, reasonable mistakes led the officers to commit the errors, but this does not dispel reasonable suspicion or probable cause. [AUMF ¶¶ 2-8, 14-17].

## A. Article II, Section 10 does not provide greater protection than the Fourth Amendment on questions of reasonable suspicion, and the Fourth Amendment analysis applies.

"Only if the federal constitution would not provide protection from the law enforcement activity under consideration, do [courts] then turn to the civil liberties protected under Article II, Section 10 of the New Mexico Constitution." *State v. Paananen*, 357 P.3d 958, 962 (N.M. 2015). When a party relies on the New Mexico constitution to prove broader protections, the interstitial approach examines whether 1) the right is protected under the federal Constitution; 2) the state constitutional claim is preserved; and 3) one of the three reasons for departing from federal precedent exists. *State v. Ochoa*, 146 N.M. 32, 36-37 (N.M. Ct. App. 2008) (quoting *State v. Cardenas-Alvarez*, 130 N.M. 386, 25 P.3d 225 (N.M. 2001)).

These reasons include ""a flawed federal analysis, structural differences between state and federal government, or distinctive state characteristics."" *State v. Lopez*, 314 P.3d 236, 239 (N.M. 2013) (quoting *State v. Gomez*, 122 N.M. 777, 932 P.2d 1 (N.M. 1997)). New Mexico courts "apply the same reasonable suspicion standard when conducting both Fourth Amendment and Article II, Section 10 analyses." *Martinez*, 457 P.3d at 259.

Fourth Amendment analysis controls the results of Plaintiff's Article II, Section 10 claims on the issue of reasonable suspicion. Yet even under Article II, Section 10's probable causes standards, the officers are entitled to summary judgment based on probable cause and the exigency supporting Plaintiff's arrest.

### B. Reasonable suspicion and overriding safety concerns justified Plaintiff's detention, even if incorrect, and undisputable probable cause supported his arrest.

Plaintiff's detention and arrest were lawful based on reasonable suspicion he committed aggravated assault with a deadly weapon and probable cause for resisting, evading or obstructing an officer ("REO"). [AUMF ¶¶ 2-8, 18-32]. The Fourth Amendment and Article II, Section 10 require reasonable suspicion to detain and probable cause to arrest a subject, and that is true of the circumstances leading to Plaintiff's arrest here. [AUMF ¶¶ 2-8, 18-32].

The facts and circumstances further demonstrated that the officers' interest in crime and harm prevention outweighed the intrusiveness of Plaintiff's detention and arrest under Article II, Section 10. [AUMF ¶¶ 2-11, 18-32]. Plaintiff's statement of undisputed material facts do not support his entitlement to summary judgment under applicable law, but City Defendants additional material facts entitle them to summary judgment and qualified immunity. Therefore, the Court must deny Plaintiff's Motion and grant the City's Cross-Motion.

### 1. The detention was reasonable under the Fourth Amendment.

While Mr. Haynes did not offer a physical description of Mr. Wright, the officers reasonably inferred Haynes was pointing to and identifying Plaintiff as "Keith Wright" after having just identified the vehicle Wright drove at the time of the assault.  [AUMF ¶¶ 2-8]. The Fourth Amendment allowed the officers to detain Plaintiff to determine whether he was armed to avoid the potential escalation of an aggravated assault with a deadly weapon into an aggravated battery with a deadly weapon.  [AUMF ¶¶ 2-11].  Mr. Haynes pointed in Plaintiff's direction while he described Mr. Wright's vehicle and the location of other nearby vehicles.  [AUMF ¶ 4]. When Mr. Haynes further identified "Keith Wright" as the aggressor amidst these descriptions, officers reasonably believed Haynes was pointing at Plaintiff – the only male in that immediate area. [AUMF ¶4].  Right or wrong, reasonable suspicion and the nature of Mr. Wright's reported crime asked no more of the officers before they approached Plaintiff.  [AUMF ¶¶ 2-8].

In relevant part, Mr. Haynes reported to officers to location of his aggressor's vehicle as

[Haynes:] [t]hat black car, *right there in front of that house*.  His name is Keith Wright.  Where the suburban is, yeah.  [Ofc. Van Zandt:] Where the suburban is and that black car?" [Haynes:] Yeah.

[AUMF ¶ 4].  Courts have adopted the commonsense understanding that officers must often act and investigate under dangerous circumstances.  Any misstatements about how an officer developed reasonable suspicion are irrelevant so long as a reasonable officer could have made the same mistake under the circumstances.  *See McHugh*, 639 F.3d at 1256 ("[W]e consider the reasonableness of an officer's actions using an 'objective standard.' The detaining officer's 'subjective beliefs and intentions' are, quite simply, irrelevant.") (internal quotations omitted).

Mr. Haynes identified Mr. Wright vehicle as the black car parked in front of a house along with a suburban parked in the driveway.  [AUMF ¶ 4]. The only dark in color vehicle visible to Ofc. Teague and Ofc. Van Zandt was a dark purple Dodge Challenger.  [AUMF ¶¶ 3-5, 7-8]. This

was also the only dark in color vehicle parked in front of any house in the area Mr. Haynes pointed to.  [AUMF ¶¶ 2-8].  The allegation that Mr. Haynes simply gestured or pointed down the street excludes the rest of his report including details of the vehicles near his aggressor's vehicle and his naming of Mr. Wright during these descriptions while he pointed down the street.  [AUMF ¶¶ 2-8; Doc. 6, pg. 2, pg. 4, PSUMF ¶ 4].  These additional material facts are the difference between reasonable suspicion and summary judgment for Plaintiff or the City.  [AUMF ¶¶ 2-8]

The vehicles visible to the officers were plainly parked at 1403 East White where Plaintiff was sitting, and Ofc. Teague and Ofc. Van Zandt reasonably inferred Mr. Haynes identified Plaintiff when he named Keith Wright while pointing toward the vehicles.  [AUMF ¶¶ 3-5, 7-8].  The Fourth Amendment permitted the other officers to reasonably rely on Ofc. Teague's observations and for the other officers on scene to do the same in detaining Plaintiff.  [AUMF ¶¶ 3-5, 7-8]; *see id*.; *United States v. Hinojos*, 107 F.3d 765, 768 (10th Cir. 1997) (Officers may pool their information to create reasonable suspicion based on their collective knowledge).  Plaintiff's detention was further consistent with officers' duties to secure the scene against someone who reportedly chased and threatened gun violence.  [AUMF ¶¶ 2-11].

Before officers arrived, Mr. Haynes fled on foot away from Mr. Wright who pointed a gun at him, threatened to shoot him, and chased him in Wright's vehicle.  [AUMF ¶¶ 1-3, 9-11].  Mr. Wright was not inside his house or a secure location when he made contact with officers.  [AUMF ¶¶ 1-2].  Mr. Haynes came out of hiding to approach officers while he was still out of breath fresh from the pursuit.  [AUMF ¶ 1].  Even if mistaken, the officers reasonably understood that Mr. Haynes identified Plaintiff as Mr. Wright.  [AUMF ¶¶ 2-8].  The timing of Plaintiff's location at the house near the subject vehicle at issue further offered circumstantial evidence that Plaintiff

could have been Mr. Wright.  [AUMF 3-6].  On these facts, Fourth Amendment reasonable suspicion favors the officers' efforts to detain Plaintiff.  [AUMF ¶¶ 2-6].

Reasonable suspicion supported Plaintiff's detention for aggravated assault with a deadly weapon to detain Plaintiff.  [AUMF ¶¶ 3-11]; *see* N.M. Stat. Ann. § 30-3-2 (1963) (Aggravated assault with a deadly weapon is "unlawfully assaulting or striking at another with a deadly weapon."); N.M. Stat. Ann. § 30-3-1 (1963) (Assault includes "an unlawful act, threat or menacing conduct which causes another person to reasonably believe that he is in danger of receiving an immediate battery[."]; *Hinojos*, 107 F.3d at 768 ("[W]e have held under the "fellow officer" rule that law enforcement officers may pool their respective information and that reasonable suspicion is to be determined on the basis of the collective knowledge of all the officers involved."); *see e.g.*, *United States v. Wilkinson*, 633 F.3d 938, 941 (10th Cir. 2011) (allowing a subjective officer to derive reasonable suspicion based on a previous officer's observations that a vehicle's license tag was covered in traffic to violate a traffic ordinance.).

Under the Fourth Amendment, an arrest occurs when "by means of physical force or show of authority, an individual's freedom of movement is restrained." *Fogarty v. Gallegos*, 523 F.3d 1147, 1155 (10th Cir. 2008). "[A] police officer "may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to arrest." *Treto-Haro*, 287 F.3d at 1004 (quoting *Terry v. Ohio*, 392 U.S. 1, 22 (1968)). "[A] brief stop of a suspicious individual in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Id*. "An investigatory detention is justified at its inception if the *specific and articulable facts and rational inferences drawn from*

*those facts* give rise to a reasonable suspicion a person has or is committing a crime." *United States v. Daniels*, 101 F.4th 770, 776 (10th Cir. 2024) (internal quotations omitted) (emphasis added).

Whether reasonable suspicion exists depends on a court's evaluation of the "totality of the circumstances" and "whether the detaining officer has a *particularized and objective basis* for suspecting legal wrongdoing." *United States v. Leon*, 80 F.4th 1160, 1165 (10th Cir. 2023) (internal quotations omitted) (emphasis added).  The standard for reasonable suspicion is measured by ""[t]he likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard."" *Mocek*, 813 F.3d at 923 (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)).

"All reasonable suspicion requires is 'some minimal level of objective justification.'" *McHugh*, 639 F.3d at 1256 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).  In fact, ""reasonable suspicion may exist even if it is more likely than not that the individual is not involved in any illegality."" *Mocek*, 813 F.3d at 923 (quoting *McHugh*, 639 F.3d at 1256)).

The Tenth Circuit has also "allowed an officer to conduct a pat-down search (or frisk) if he or she harbors an articulable and reasonable suspicion that the person is armed and dangerous." *Cronick*, 99 F.4th at 1272. Yet, "[a] reasonable mistake of fact may support reasonable suspicion." *Bustillos*, 98 F.4th 1022 at 2024 ("[Courts] may weigh objectively reasonable mistakes of fact made by the officer in favor of reasonable suspicion.").  The officers lawfully detained Plaintiff with valid and objective – even if reasonably mistaken – reasonable suspicion based on suspicion that developed before they approached him.  [AUMF ¶¶ 1-11]; *see id*.

The Fourth Amendment did not require the officers to simply accept Plaintiff's denial that he was not the aggressor and uninvolved in the assault particularly when Plaintiff was suspected of committing a violent felony that continued to present a potential risk of danger.  [AUMF ¶¶ 19-

21]; *see Leon*, 80 F.4th at 1165; *Mocek*, 813 F.3d at 923 ("'The likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard…reasonable suspicion may exist even if it is more likely than not that the individual is not involved in any illegality.'"). The circumstances also offered additional grounds to suspect Plaintiff could have accomplished what the officers thought they understood from Mr. Haynes. [AUMF ¶¶ 2-11].

Plaintiff argued he had just arrived on scene when he was arrested, but this would not have dispelled reasonable suspicion that he threatened Mr. Haynes with a gun in the same area minutes earlier. [AUMF ¶¶ 2-11, 14-17,19-21]; *see id*. at 928. "Officers may weigh the credibility of witnesses in making a probable cause determination. Police officers are not required to forego making an arrest based on facts supporting probable cause simply because the arrestee offers a different explanation." *Id*. (quoting *Baptiste v. J.C. Penny Co.*, 147 F.3d 1252, 1259 (10th Cir. 1998) and *Munday v. Johnson*, 257 F.32); *see McHugh*, 639 F.3d at 1256 (On questions of reasonable suspicion, courts "defer to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions. [Courts] judge the officer's conduct in light of common sense and ordinary human experience.").

Mr. Haynes described his flight away from Mr. Wright's vehicle as in the very neighborhood the officers found Haynes and Plaintiff in. [AUMF ¶¶ 1-7]. Officers made contact with Plaintiff about 100 yards away from Mr. Haynes while Plaintiff appeared to be at the same property as Mr. Wright's vehicle. [AUMF ¶ 3]. Plaintiff's location was circumstantial evidence that he could have chased Mr. Haynes with a gun before exiting his vehicle at the same address. [AUMF ¶¶ 1-7]. At best, the timing of Plaintiff's location implicated his perceived role in the

aggravated assault with a deadly weapon.  [AUMF ¶¶ 1-7].  At worst, Plaintiff's location is ambiguous to this question.  [AUMF ¶¶ 1-7].

Nothing that the officers observed between Mr. Haynes' initial report and officers' contact with Plaintiff reasonably contradicted their suspicion that Plaintiff may have committed aggravated assault with a deadly weapon.  [AUMF ¶¶ 1-11, 18-21]; *see id*.; *Donahue v. Wihongi*, 948 F.3d 1177, 1198 (10th Cir. 2020) ("The record shows no events in the short interval between [the plaintiff's] admissions (which supplied reasonable suspicion to demand his name) and his refusal to provide his name (which provided probable cause to arrest) that could have dispelled the initial reasonable suspicion.").

The only contrary information known to the officers when they made contact with Plaintiff was his allegation that he was Ronnie Brooks, denial of his involvement, and his calling out to "Uncle Keith" which would have been immaterial to the officers who did not know Mr. Wright was the reported aggressor.  [AUMF ¶¶ 1, 4, 20, 22]; *see id*.  Mr. Haynes offered enough to reasonably infer that, even if it was less likely Plaintiff was his aggressor, reasonable and articulable facts supported a potential suspect's brief detention until the officers could stabilize the scene and further investigate.  [AUMF ¶¶ 2-11]; *see id*.; *Daniels*, 101 F.4th at 776 ("An investigatory detention is justified at its inception if the *specific and articulable facts and rational inferences drawn from those facts* give rise to a reasonable suspicion a person has or is committing a crime.") (emphasis added).  N.M. Stat. Ann. § 30-3-2 (1963).

Whether the officers erroneously described how they inferred Mr. Haynes had implicated Plaintiff, the fact remains that Haynes' report objectively implicated Plaintiff.  [AUMF ¶¶ 13, 35, 37, 41]; [Doc. 6-1, Ex. A-12, pg. 30]; [Doc. 6-1, Ex. A-13, pg. 40]; *see e.g.*, *United States v. Ceballos*, 355 F. App'x 226, 229 (10th Cir. Dec. 9, 2009) (unpublished) (An officer's "subjective

characterization of his actions [wa]s irrelevant[,]" when the officer claimed to have been acting on a [mere] "hunch," because the officer articulated specific facts that reasonably caused him to suspect the criminal defendant was going to assault or abduct a teenage pedestrian). There is also no indication that the officers intentionally or recklessly misidentified Plaintiff. [AUMF ¶¶ 2-11, 14-17, 34-42]; *see also Harte v. Bd. of Comm'rs*, 864 F.3d 1154, 1179 (10th Cir. 2017) (When there is no dispute over the material facts on the issue of probable cause supporting a search warrant, "[t]o overcome the validity of the search warrant, the [plaintiff]s must present evidence either that the deputies knew that the information in the search-warrant affidavit was false or that the deputies in fact entertained serious doubts as to the truth of their allegations, but still sought a search warrant in reckless disregard for the truth.") (internal quotations omitted).

Even though some of the details as to how the officers derived reasonable suspicion are incorrect, plaintiff must still prove "that the misstatement[s] in the report and the officers' failure to recognize that mistake were intentional, rather than out of negligence or inadvertence." [AUMF ¶¶ 13-17, 34-42]; [Doc. 6-1, Ex. A-12, pg. 30]; [Doc. 6-1, Ex. A-13, pg. 40]; *Novitsky v. City of Aurora*, 491 F.3d 1244, 1258 (10th Cir. 2007). Body-worn camera footage from the officers supplies an objective view of the situation showing the information known to each at each operative moment when 1) Mr. Haynes pointed to and described the vehicle Mr. Wright drove down the street while naming him; 2) when officers arrived; and 3) what they knew when they made contact with Plaintiff. [AUMF ¶¶ 2-9]. Considering the totality of the circumstances, the officers reasonably misunderstood that Plaintiff was Mr. Wright, and there is no indication that they intentionally or recklessly arrested him. [AUMF ¶¶ 2-11]; *see id*.

The officers' mistake of fact cannot dispel the reasonable suspicion or the danger arising from reasonably misunderstood circumstances. [AUMF ¶¶ 2-11, 14-17]; *see Bustillos*, 98 F.4th at

1030 ("A reasonable mistake of fact may support reasonable suspicion."); *Mocek*, 813 F.3d at 923 (""[R]easonable suspicion may exist even if it is more likely than not that the individual is not involved in any illegality.""). Though mistaken, reasonable suspicion supported Plaintiff's detention. [AUMF ¶¶ 2-11]; *see Leon*, 80 F.4th at 1165; *id*. The facts known to the officers, at least, supplied "'some minimal level of objective justification []'" to arrest Plaintiff. [AUMF ¶¶ 2-11]; *McHugh*, 639 F.3d at 1255.

When a suspected crime is one suggesting suggestion a subject is armed and dangerous, an officer may reasonably pat down the subject. *United States v. Hammond*, 890 F.3d 901, 905 (10th Cir. 2018) (internal quotations omitted). Courts "have only allowed an officer to conduct a pat-down search (or 'frisk') if he or she harbors an articulable and reasonable suspicion that the person is armed and dangerous." *United State v. Garcia*, 459 P.3d 1059, 1064 (10th Cir. 2006) (internal quotations omitted). "[O]fficers "'need not be absolutely certain that an individual is armed' before taking protective measures" such as a pat-down search []." *Id*. (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). A frisk is reasonable "[e]ven when an officer had limited 'specific information leading him to believe that an individual was armed or dangerous' and no knowledge of the individual's having possession a weapon." *United States v. Fager*, 811 F.3d 381, 385 (10th Cir. 2016) (internal quotations omitted) (quoting *United States v. Garcia*, 751 F.3d 1139, 1142 (10th Cir. 2014)).

The Tenth Circuit decision in *Sherouse v. Ratchner* is instructive as to how officers' mistakes of fact can still justify a Fourth Amendment seizure, though the legal cause standard in *Sherouse* was based on the more stringent probable cause standard. *Sherouse v. Ratchner*, 573 F.3d 1055, 1061-1062 (10th Cir. 2009). The *Sherouse* officers arrested the plaintiffs, a 13-year-old Hispanic girl Sylvia Avila and a 14-year-old black girl Glenda Sherouse suspecting their involvement in three armed robberies that day. *Id*. at 1057-1058.

Robbery witnesses described the robber as a black female standing at roughly 5'2" weighing around 110 or 120 pounds. Conflicting dispatch reports indicated that the robber was either a black female juvenile or a black female adult. *Id*. at 1058. Shortly after the robberies, police responded to an unrelated call from an apartment resident who lived near the robbed store. *Id*. The reporting resident claimed two suspicious young females – the plaintiffs – were sitting on the curb outside her apartment reporting that one of the plaintiffs put on a sweater given to her by the other plaintiff. *Id*.

An investigating officer concluded that the plaintiffs had been visiting a friend at the complex and returned to retrieve a sweater belonging to the other plaintiff before leaving for one of the plaintiff's apartments. *Id*. When police later spotted the plaintiffs outside one of their apartments, an officer concluded Ms. Sherouse matched the description of the robber and the plaintiff described in the unrelated call who had also visited who visited Ms. Avila. *Id*. The officer handcuffed and detained Ms. Sherouse, "because she potentially was the one that was armed." *Id*.

The officers brought robbery witnesses to identify the plaintiffs. *Id*. The witnesses offered mixed reports as to whether the witnesses firmly identified Ms. Sherouse. *Id*. Yet, officers testified that several witnesses identified Ms. Sherouse as the robber without any witness implicating Ms. Avila. *Id*. Nonetheless, the officers arrested both plaintiffs to continue the investigation on the theory that Ms. Sherouse was the robber and Ms. Avila aided and abetted or conspired with her by giving Sherouse a sweater to disguise herself with. *Id*.

At trial, the jury found in the officers' favor on probable cause as to Ms. Sherouse. *Id*. at 1059. On appeal, the Tenth Circuit affirmed observing that the officers' mistaken arrest was based on misidentification, because

> [t]he officers *correctly understood the nature of the alleged crime*; *their error was entirely in concluding that Ms. Sherouse's description matched that given by dispatch*, in crediting the statements of witnesses who, according to the officers, identified Ms. Sherouse as the robber, and in overestimating the significance of other circumstantial evidence.

*Id*. at 1060, 1062. The officers claimed they detained Ms. Sherouse only after three witnesses positively identified her or suggested it was likely she was the robber. *Id*. at 1061. Ms. Sherouse offered rebutting evidence showing at least two of the officers failed to claim these witnesses identified her in their reports with an officer offering a contradictory account in the incident report that, "no one was able to positively identify Sherouse as the offender. All witnesses were uncertain." *Id*.

Two witnesses also testified that the officers misrepresented whether they had identified Ms. Sherouse as the robber. *Id*. Still, the objective evidence was enough to support probable cause based on one of the witness's admission that she told an officer that Ms. Sherouse looked similar to the robber. The dispatch report describing the robber as a black female juvenile rather than a black female adult also supported probable cause even if it was mistaken. *Id*. Ms. Sherouse's physical resemblance to the robber, proximity to the robberies, and the officers' reasonable belief that several of the witnesses suggested she was the robber supported the reasonable inference that officers held probable cause to arrest her. *Id*. On these grounds, the Tenth Circuit affirmed the denial of Ms. Sherouse's trial motion for judgment as a matter of law. *Id*.

As to Ms. Avila, the Tenth Circuit concluded differently finding no reasonable basis for probable cause. *Id*. at 1061-1062. The evidence consisted of the reporting resident's claim that Ms. Avila appeared suspicious, because 1) she sat with Ms. Sherouse in front of the apartment complex while staring at the reporting resident; 2) Avila entered a friend's apartment to collect Sherouse's red sweater and gave the sweater to Sherouse; and 3) Avila and Sherouse were friends.

*Id.*  These facts did not support a reasonable inference of probable cause to arrest Ms. Avila for aiding and abetting or conspiring to aid Ms. Sherouse in an armed robbery.  *Id.* at 1058, 1062.  Ms. Avila's reported conduct simply did not implicate a crime.  *Id.*

Here, the nature of the *Sherouse* officers' mistakes is materially similar and distinguishable in ways that prove reasonable suspicion supported Plaintiff's detention even with the officers' mistake.  [AUMF ¶¶ 2-11]; *compare id.* at 1061-1062.  Unlike the *Sherouse* evidence suggesting witnesses had not or could not link Ms. Sherouse with the robbery, the officers were not aware of any credible contrary evidence suggesting Plaintiff had not committed aggravated assault with a deadly weapon outside of his own report.  [AUMF ¶¶ 2-13, 19-22]; *see Mocek*, 813 F.3d at 928 ("Police officers are not required to forego making an arrest based on facts supporting probable cause simply because the arrestee offers a different explanation.");  *McHugh*, 639 F.3d at 1256 (Courts "defer to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions. [Courts] judge the officer's conduct in light of common sense and ordinary human experience.");  *compare id.* at 1060, 1061-1062.  As far as the officers understood, a direct witness/victim identified his aggressor as Plaintiff without evidence that could dispel reasonable suspicion.  [AUMF ¶¶ 2-11, 14-17, 19-22].

If the *Sherouse* officers' known facts were sufficient for probable cause, certainly the officers here had enough to support reasonable suspicion.  [AUMF ¶¶ 2-11]; *compare id.*  The *Sherouse* officers encountered conflicting reports about the identity of the robber while still claiming at least three witnesses identify Ms. Sherouse as the robber.  *Compare id.* at 1061. Against this, two witnesses directly accused the officers of misrepresenting what they identified which was further inconsistent with reports that none of the witnesses could positively identify the robber and were uncertain as to who had.  *Compare id.*  Still, the dispatch report and a single

witness' comment that Ms. Sherouse looked like the robber was enough to arrest her. *Compare id*.

Like the *Sherouse* officers, the HPD officers "correctly understood the nature of the alleged crime," i.e., aggravated assault with a deadly weapon. [AUMF ¶¶ 2-11]; *compare id*. at 1060. The *Sherouse* and HPD officers also committed similar errors in identifying the wrong subject based on witness reports. *Compare id*. The *Sherouse* officers' mistake was reasonable based on the dispatch report and one witness' claim while overestimating the significance of Ms. Sherouse's proximity to the area where the robbery occurred and facts concerning the red sweater. *Compare id*. at 1060, 1061-1062. The HPD officers' mistake was based on a mistaken inference from the only apparent witness/victim Mr. Haynes plus supporting circumstantial evidence supporting the plausibility of Plaintiff as the aggressor also based on his proximity to where the crime was committed. [AUMF ¶¶ 2-11]; *compare id*.

If the *Sherouse* officers' mistake as to probable cause supporting Ms. Sherouse's arrest was reasonable, that must be true of HPD officers' mistake as the facts supporting reasonable suspicion and Plaintiff's detention for aggravated assault with a deadly weapon without any contrary indications outside of the detained party's argument otherwise. [AUMF ¶¶ 2-11]; *compare id*. *Sherouse* and the objective nature of Fourth Amendment reasonable suspicion supported Plaintiff's arrest based on the officers' reasonable misunderstanding that Mr. Haynes identified Plaintiff as Mr. Wright, and Plaintiff's close proximity to the vehicle and house where Wright's vehicle was parked. [AUMF ¶¶ 2-11].

The circumstances of what and how the information came to the officers also does not reflect any intention to falsely detain or arrest Plaintiff. [AUMF ¶¶ 2-11]; *see Novitsky*, 491 F.3d at 1258 (The plaintiff must prove that misstatements in a report and officers' failure to recognize

these mistakes were intentional, rather than negligent or inadvertent.).  Accordingly, the officers held valid reasonable suspicion based on reasonably misunderstood facts. [AUMF ¶¶ 2-11].

### 2.  Plaintiff's detention was reasonable under Article II, Section 10.

Plaintiff's detention under Article II, Section 10 was lawful just as is true under the Fourth Amendment.  [AUMF ¶¶ 2-11].  Like the Fourth Amendment, Article II, Section 10 "control[s] the validity of investigative stops[.]." *State v. Anaya*, 143 N.M. 431, 433, 176 P.3d 1163 (N.M. Ct. App. 2007).  Both the Fourth Amendment and Article II, Section 10 guide the analysis to the same conclusion – Plaintiff's detention did not violate his constitutional rights. "The key inquiry under Article II, Section 10 is reasonableness." *Ketelson*, 150 N.M. at 144.  Article II, Section 10 "expresses the fundamental notion that every person…is entitled to be free from unwarranted governmental intrusions." *Id*. (quoting *State v. Gutierrez*, 116 N.M. 431, 444, 863 P.2d 1052 (N.M. 1993)). "[R]easonableness depends on the balance between the public interest and the individual's interest in freedom from police intrusion upon personal liberty." *Id*.

Police officers may approach and detain a person to investigate a crime without probable cause "if the officer is aware of specific articulable facts, together with rational inferences from those facts, that, when judged objectively, would lead a reasonable person to believe criminal activity occurred or was occurring." *State v. Simpson*, 388 P.3d 277, 280 (N.M. Ct. App. 2016) (internal quotations omitted). "Reasonable suspicion is a commonsense, nontechnical conception, which requires that officers articulate a reason, beyond a mere hunch, for their belief that an individual has committed a criminal act." *Olson*, 285 P.3d at 1069.

"Reasonable suspicion is viewed from the perspective of what the officer *knew* at the time the officer detained a suspect." *Aguilar*, 488 P.3d at 703. "The subjective belief of the officer does not in itself affect the validity of the detention; it is the evidence known to the officer that counts"

under the totality of the circumstances. *State v. Hubble*, 146 N.M. 70, 74, 73, 206 P.3d 579 (N.M. 2009). When an officer "was mistaken as to the underlying facts, that mistake of fact does not undercut his objective grounds for reasonable suspicion." *Aguilar*, 488 P.3d at 704 (citing *Hubble*, 146 N.M. at 77) ("[A]n officer can have reasonable suspicion even if it turns out he was mistaken about the facts.").

Ofc. Teague's error in believing Plaintiff was who Mr. Haynes was implicating is not an Article II, Section 10 deprivation considering the reasonably confusing circumstances and the seriousness of their potential implications described above. [AUMF ¶¶ 2-11]. Ofc. Teague was also acutely aware of the potentially dire consequences might follow from underestimating a lethal assailant while the assailant may have been within sight of his victim. [AUMF ¶¶ 10-11]. Ofc. Teague appreciated the risk to nearby bystanders and neighbors at home on a Saturday morning. [AUMF ¶¶ 10-11]. What would have been a temporary intrusion on Plaintiff's Article II, Section 10 rights had to yield to legitimate and serious public and officer safety concerns. [AUMF ¶¶ 2-11, 18].

Like the Fourth Amendment, Article II, Section 10 allows "an officer's reasonable belief that a suspect is armed and dangerous [to] follow from a reasonable suspicion that the suspect has committed, is committing, or will commit an "inherently dangerous crime." *Arredondo*, 123 N.M. at 633. "Aggravated assault, or assault with a deadly weapon, is an inherently dangerous crime and a felony." *Madsden*, 129 N.M. at 254 (citing N.M. Stat. Ann. § 30-3-2(A) (1963) (Aggravated assault with a deadly weapon is "unlawfully assaulting or striking at another with a deadly weapon.")); *see generally* N.M. Stat. Ann. § 30-3-1 (1963) (Assault is "an unlawful act, threat or menacing conduct which causes another person to reasonably believe [they are] in danger of [] an immediate battery[.").  As must be true in this instance, "[c]oncerns for officer safety are

undoubtedly legitimate and weigh heavily in the reasonableness calculus." *Ketelson*, 150 N.M. at 145.

The officers properly acted on facts indicating 1) Mr. Haynes' assailant parked his car at a house down the street; 2) the assailant's name was Keith Wright; 3) Mr. Wright pointed a gun at Haynes; and 4) Wright was just down the street next to his car. [AUMF ¶¶ 2-13]. When Ofc. Teague heard Mr. Haynes disclose that Mr. Wright tried to "shoot [him] again," that Teague responded by telling officers to go check Plaintiff to contain what he reasonably believed was a potential source of a reported gun assault. [AUMF ¶¶ 9-13]; *see Arredondo*, 123 N.M. at 633; *id.*

A responding officer must not ignore the potentially immediate and lethal consequences that might follow from a report of a subject chasing someone with a gun threatening to shoot from a vehicle in a residential area. *See id.* This is particularly true when the reported subject is identified minutes later with the same vehicle and in the same area. [AUMF ¶¶ 2-11]; *see id.*; *Ketelson*, 150 N.M. at 144 ("[R]easonableness depends on the balance between the public interest and the individual's interest in freedom from police intrusion upon personal liberty.").

Ofc. Teague did not rely on an unsupported hunch when he ordered officers to detain Plaintiff, he reasonably understood Mr. Haynes was referring to Plaintiff as Haynes continued describing the situation and Mr. Wright's vehicle. [AUMF ¶¶ 2-11]. In another aggravated assault with a deadly weapon case in *Arredondo*, officers relied on a victim's report who claimed two gunmen in a *maroon* Monte Carlo sedan threatened him with a gun. *Arredondo*, 123 N.M. at 631. The victim admitted to being an alcoholic and smelled of alcohol. *Id.* Still, the officers credited the victim's report and stopped a *brown* Monte Carlo traveling away from the location where the vehicle was spotted. *Id.*

The driver gave an officer a "funny look" as they drove past each other prompting the officer to turn around, follow the vehicle, and stop the driver at a gas station. *Id*. The officer noticed the driver was alone, unlike the reported gunmen, yet requested the subject's license and proof of insurance. *Id*. The driver admitted lacking insurance, driving with a suspended license, and being wanted on warrants. *Id*.

With only this, the *Arredondo* court upheld the probable cause for a protective search of the vehicle. *Id*. at 632. The officer's suspicion that the driver was involved in an aggravated assault was reasonable and had not been dispelled at the time of the search, so it "was reasonable to search the front seats and adjacent floor area of [the] vehicle to check for weapons because there were exigent circumstances to justify this limited search for weapons during the investigatory stop." *Id*. at 632; *see State v. Rowell*, 144 N.M. 371, 376, 188 P.3d 95 (N.M. 2008) (A search of an automobile could not be condoned "unless the area searched was at that time within the range of the arrestee's potential ability to access any weapons, evidence or other means of escape.").

Like the *Arredondo* officers, the HPD officers detained the wrong person but with more proof than the *Arredondo* officers had. [AUMF ¶¶ 2-11]; *compare id.* at 631-632. The *Arredondo* officers stopped a vehicle with the same make and model as the reported assailant, but the vehicle was a different color and without two reportedly involved companions. *Compare id*. at 631. The *Arredondo* officer's suspicions were based on nothing more than the plaintiff's "funny look" and a similarly colored vehicle with the same make and model. *Compare id*. The *Arredondo* facts are a far cry from Mr. Haynes' direct identification of the assailant and his vehicle. [AUMF ¶¶ 2-11, 17-19]; *compare id*. Plaintiff's location also suggested the crime could have occurred when, where, and how Haynes reported it. [AUMF ¶¶ 2-11, 17-19]; *compare id*. The only indication HPD

officers detained the wrong person was based only on the implicated person's claim.   [AUMF ¶¶ 18-22]; *Compare id*.

The New Mexico Court of Appeals has recognized the weight of similar inferences based on a suspect's location and timing.  In *Simpson*, dispatch reported a parked DWI in the parking lot of a restaurant described as a dark blue Plymouth with a partial New Mexico plate.  *State v. Simpson*, 388 P.3d 277, 279 (N.M. Ct. App. 2016).  According to the dispatch report, a male entered the restaurant, passed out in the bathroom, and smelled of alcohol.  *Id*.  The report further clarified that the male got up, left the restaurant, and moved his vehicle a few parking spaces away nearly striking other vehicles. *Id*.  The vehicle's dark tint prevented the officer from seeing inside, so he opened the front door, smelled alcohol, and saw the plaintiff in the backseat.  *Id*.

In support of the officer's arrest, the officer "reasonably could infer that the car was the subject of the dispatch, and reasonably could suspect that the man described by the caller might be in the care and he might have engaged in the criminal activity of driving while intoxicated minutes before." *Id*. at 281.  In this case, the reporting party directly spoke with officers and seemed to point out the suspect which was further consistent with the location and timing of where the officers found the suspect based on a crime committed minutes earlier.  [AUMF ¶¶ 2-11, 17-19]; *Id*.

*Arredondo* and *Simpson* illustrate the points that specific articulable suspicions can be correct or incorrect, but the calculus comes down to a commonsense parsing of what is known and whether these inferences directed the officer to the detained party.  *Compare id*.; *Arredondo*, 123 N.M. at 632, 632.  On the law and undisputed material facts, the officers did not violate Article II, Section 10 based on the mistaken but reasonable suspicion leading them to Plaintiff.  [AUMF ¶¶

2-11, 18-22].  Therefore, the Court must deny Plaintiff summary judgment and enter summary judgment for City Defendants.

### 3.  Probable cause supported Plaintiff's arrest under the Fourth Amendment.

There is no legitimate dispute that Plaintiff repeatedly refused to comply with officers' commands and physically resisted attempts to detain him.  [AUMF ¶¶ 18-32].  Plaintiff tried to flee three times, refused many commands to comply, and was twice tased before officers could wrestle him into compliance.  [AUMF ¶¶ 22-32].  That is, Plaintiff resisted and attempted to flee and evade arrest consistent with the factors supporting probable cause to arrest him for REO.  [AUMF ¶¶ 22-32].

Fourth Amendment probable cause "exists only when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information" to cause a reasonable person to belief an offense has or is being committed.  *Cortez v. McCauley*, 478 F.3d 1108, 1116 (10th Cir. 2007) (internal quotations omitted). In other words, "[w][hether a situation indicates probable cause for arrest depends on an officer's subjective understanding of the facts, as well as the objective application of the law to those facts." *Sherouse*, 573 F.3d at 1059.

Courts "'examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to 'probable cause.'" *Cortez*, 478 F.3d at 116 (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 56 – 57 (2018)).  Even so, the United States "Supreme Court has held that a police officer's reasonable mistake of fact does not negate probable cause, [because] the Fourth Amendment does not require "factual accuracy." *Sherouse*, 573 F.3d at 1059 (citing *Ill. v. Rodriguez*, 497 U.S. 177, 185 (1990)).

Body worn camera footage leaves no doubt that Plaintiff was attempting to resist and flee from a lawful detention.  [AUMF ¶¶ 19-32].  This conduct comes with consequences under N.M. Stat. Ann. § 30-22-1(D) (1981) for REO.  [AUMF ¶¶ 19-32].  REO criminalizes

> *intentionally fleeing, attempting to evade* or evading *an officer* [] when the person [] has knowledge that the officer is attempting to apprehend or arrest him; [] *or resisting* or abusing any judge, magistrate or *peace officer in the lawful discharge of his duties*.

N.M. Stat. Ann. § 30-22-1(D) (1981) (REO is a misdemeanor.) (emphasis added).

"The New Mexico Court of Appeals has interpreted the phrase "resisting or abusing" in section 30-22-1(D) to forbid three types of conduct: (1) physical acts of resistance," (2) the use of "fighting words," and (3) the refusal to "obey" lawful police commands." *Corona v. Aguilar*, 959 F.3d 1278, 1283 (10th Cir. 2020) (quoting *State v. Wade*, 100 N.M. 152, 667 P.2d 459 (N.M. Ct. App. 1983) and *N.M. v. State Diaz*, 121 N.M. 28, 908 P.2d 258 (N.M. Ct. App. 1995) (citing *State v. Jimenez*, 392 P.3d 668 (N.M. Ct. App. 2017).

Plaintiff's actions include physical resistance to verbal commands and officer's physical attempts to wrest him into compliance, or the first and third forms of REO.  [AUMF ¶¶ 19-32]; *see id*.  Broken down, this includes 1) officers' lawful commands to yield to detention; 2) Plaintiff's attempt to run from law enforcement after had a hold off him and stood him up; 3) his refusal to turn onto his belly so that his hands could be handcuffed, 4) his additional attempt to run away, and 5) his refusal to turn over or produce his hands until officers wrested him into position with the use of two taser cycles.  [AUMF ¶¶ 19-32].

These facts are more than sufficient to support probable cause that Plaintiff committed REO.  [AUMF ¶¶ 19-32]; *compare State v. LeFebre*, 130 N.M. 130, 136 (N.M. Ct. App. 2001) (A refusal to stop a vehicle and a subject's flight on foot were two separate REO violations).  On these

undisputed material facts, the Court must deny Plaintiff's request for summary judgment as to his Fourth Amendment and Article II, Section 10 unreasonable arrest claims and enter qualified immunity and summary judgment on the additional undisputed material facts.  [AUMF ¶¶ 19-32].

### 4.  Probable cause supported Plaintiff's arrest for REO under Article II, Section 10.

Even if Plaintiff could proceed to a review of his claims under Article II, Section 10, the predicate probable cause, exigency, and balance of the intrusion supported his arrest. [AUMF ¶¶ 19-32]. "Article II, Section 10 [] requires that all warrantless arrests be reasonable." *State v. Veith*, 516 P.3d 177, 180 (N.M. Ct. App. 2022) (quoting *Campos v. State*, 117 N.M. 155, 157, 870 P.2d 117).

A warrantless arrest is reasonable if "the officer had probable cause to believe that the person had committed or was about to commit a felony and some exigency existed that precluded the officer from securing a warrant." *Paananen*, 357 P.3d at 963 (quoting *Campos*, 117 N.M. at 159); *Milliron v. Cty. of San Juan*, 384 P.3d 1089, 1098 – 1099 (N.M. Ct. App. 2016) (For a misdemeanor arrest, the subject must commit the offense in the officer's presence.).

Exigencies supporting a warrantless arrest include "an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence." *Veith*, 516 P.3d at 184 (internal quotations omitted).  Additionally, "there are other situations in which an exigency not necessarily amounting to an imminent threat of danger, escape, or lost evidence will be sufficient to render reasonable a warrantless public arrest supported by probable cause []." *Id*. (quoting *Paananen*, 357 P.3d at 964 – 965). "An on-the-scene arrest supported by probable cause will usually supply the requisite exigency." *Id*. (quoting *Paananen*, 357 P.3d at 965, 964 (In which a warrantless arrest for shoplifting was constitutional, because the time and information to act on the violation did not

arise before responding to the call and detaining the subject to obtain a warrant would have resulted in a *de facto* arrest).

The reasonableness of an arrest under Article II, Section 10 further entails "an examination into the reasonableness of officers' actions under the circumstances of each case." *State v. Leyva*, 149 N.M. 435, 452, 250 P.3d 861 (N.M. 2011). Courts look to "the facts of each case by balancing the degree of intrusion into an individual's privacy against the interest of the government in promoting crime prevention and detection." *State v. Tapia*, 414 P.3d 332, 343 (N.M. 2018).

Plaintiff had not committed the acts supporting his arrest for REO until after officers arrived which supported the exigency to arrest him. [AUMF ¶¶ 19-32]; *see Veith*, 516 P.3d at 184 ("[T]here are other situations in which an exigency not necessarily amounting to an imminent threat of danger, escape, or lost evidence will be sufficient to render reasonable a warrantless public arrest supported by probable cause []" and "[a]n on-the-scene arrest supported by probable cause will usually supply the requisite exigency.").

On the undisputed material facts, Plaintiff's Article II, Section 10 claims interpreted through the Fourth Amendment or Article II, Section 10 fail on summary judgment. [AUMF ¶¶ 19-32]. The Court must deny Plaintiff's Motion as to the claims in Counts I and II and enter summary judgment against these counts under the additional undisputed material facts demonstrating reasonable suspicion and probable cause supported his detention and arrest. [AUMF ¶¶ 2-11, 19-32].

**II.   Plaintiff has not carried his two-part qualified immunity burden to pursue his Fourth Amendment unreasonable seizure claims.  Thus, the Court must deny Plaintiff's Motion and enter qualified immunity and summary judgment for the officers against Count II.**

As argued above, Plaintiff cannot prove underlying Fourth Amendment constitutional violations.  *See Emmett*, 973 F.3d at 1132.  Plaintiff is also unable to prove the second qualified immunity prong to prevail on summary judgment against the officers.  [Doc. 6, pg. 11-14]; *see id*. On the second prong's question of a clearly established violation, the Response relies on *Romero v. Story*, 672 F.3d 880, 883-884 (10th Cir. 2012), *Reynolds v. Powell*, 370 F.3d 1028, 1030 (10th Cir.2004) and the general case law outlining an officer's authority and limitations to conduct *Terry* frisks.  [Doc. 6, pg. 11-14, 16-17].  *Romero* does not fit to prove either a Fourth Amendment lack of reasonable suspicion or a clearly established violation.  [AUMF ¶¶ 1-11].

Equally, general recitations of law cannot prove a clearly established violation nor are the facts sufficient to prove an obvious violation without the assistance of on-point case law or a consensus of sister circuits demonstrating the same.  [Doc. 6, pg. 16]; *see City of Tahlequah*, 595 U.S. at 12 ("We have repeatedly told courts not to define clearly established law at too high a level of generality."); *Mullenix*, 557 U.S. at 12 (The clearly established "inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition."); *White*, 580 U.S. at 79-80 ("General statements of the law are not inherently incapable of giving fair and clear warning to officers, but in the light of pre-existing law the unlawfulness must be apparent."); *Wesby*, 583 U.S. at 64 (In "rare obvious cases where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances," courts may find a waiver of an officer's qualified immunity.); *Leiser*, 903 F.3d at 1140 (10th Cir. 2018) ("Ordinarily,

[] the plaintiff must rely on an on-point precedent of this court or the Supreme Court or a clear consensus of a significant number of fellow circuit courts.").

The *Romero* reporting party's vandalism complaint lacked credibility as based on the identification of a Hispanic male in the parking lot when he noticed his vehicle was vandalized without seeing the subject actually commit the act. *See id*. at 883, 887-888. The reporting party "did not observe [the p]laintiff committing any crime." *Id*. at 887. The "[p]laintiff's temporal and geographic proximity to the crime *alone* [wa]s not sufficient [] to provide [the officers] with reasonable suspicion." *Id*. (emphasis added).

While the *Romero* court did not find a case sufficiently on point sufficient to prove a clearly established violation, *Romero*'s facts were still analogous with those in *United States v. Davis*, 94 F.3d 1465 (10th Cir. 1996) where reasonable suspicion did not lie. *Id*. In *Davis*, officer observed a vehicle parked just north of a "juice joint," or a business illegally selling liquor without a license with a subject exiting, making eye contact with officers, breaking eye contact, and then walking toward the juice joint. *Id*. The officers knew the subject was associated with a gang, had been acquitted of a gang-related homicide, and was known to have sold narcotics. *Id*. Yet, none of these facts together established a particularized and objective basis to suspect the subject intended to illegally purchase alcohol. *Id*.

*Romero* was too dissimilar from the facts leading to a finding of reasonable suspicion in *Id*. (citing *United States v. Sanchez*, 519 F.3d 1208, 1211 (10th Cir. 2008)). The *Sanchez* reporting party excitedly flagged down officers to report that she saw a man in a gray shirt striking a woman in the face at an intersection a block away. *Sanchez*, 519 F.3d at 1211. The officers quickly went to the intersection and saw a blue sedan and a white van hurriedly driving away from a house as neighbors pointed at the vehicle as if to say "that's them." *Id*.

Despite that the tip was anonymous, "the tip was not overly general because the woman offered a partial clothing description, the tip was spatially specific, and the additional inferences arising from the two vehicles that sped away as neighbors pointing officers at them. *Id*. at 1214-1215. On the contrary in *Romero*, there was only the plaintiff's temporal and geographic proximity without more. *Romero*, 672 F.3d at 887.

In the present case, Ofc. Teague reasonably understood from the victim that 1) Mr. Haynes was the victim; 2) directly identified the vehicle his assailant drove; 3) named his assailant; and 4) pointed at the assailant. [AUMF ¶¶ 2-9]. *Romero*'s report did not come from the victim who would have known who assaulted her. *Compare id*. at 883, 887-888. The *Romero* reporting party's report lacked these additional inferences of reasonable suspicion connecting the suspected party to the crime. *See Ullery*, 949 F.3d at 1291 (""The dispositive question is 'whether the violative nature of the *particular* conduct is clearly established.'"") (quoting *Mullenix*, 557 U.S. at 12); *compare id*.

Rather, reasonable suspicion in this case is similar to *Sanchez* and the Fourth Amendment precedent discussed above. [AUMF ¶¶ 2-9]. Plaintiff has also not offered any clearly established case law to support a lack of probable cause. [Doc. 6]; *See Emmett*, 973 F.3d at 1132. Plaintiff has not carried his two-part burden to prove a constitutional violation that was clearly established at the time of this incident based on a lack of reasonable suspicion or probable cause. [Doc. 6]; *see id*.

Accordingly, the Court must deny Plaintiff summary judgment and enter qualified immunity and summary judgment for the officers against the Fourth Amendment unreasonable seizure claims challenging the lawfulness of his detention and arrest in Count II. [AUMF ¶¶ 2-11]; [Doc. 1, pg. 11-12]. *See Emmett*, 973 F.3d at 1132.

**CONCLUSION**

On the foregoing grounds, the Court must deny Plaintiff's Motion for Partial Summary Judgment Memorandum in Support [Doc. 6] as to Counts I and II [Doc. 1, pg. 10-12] on undisputed material facts demonstrating that City Defendants lawfully arrested Plaintiff under Article II, Section 10 and the Fourth Amendment.  On these same counts, the Court must further enter qualified immunity and summary judgment for City Defendants on the additional undisputed material facts provided herein.  [AUMF ¶¶ 2-11, 19-32]; [Doc. 1, pg. 10-12].

Respectfully submitted,

MYNATT SPRINGER P.C.

BLAINE T. MYNATT
New Mexico Bar No. 9471
HALEY R. GRANT
New Mexico Bar No. 145671
P.O. Box 2699
Las Cruces, New Mexico 88004-2699
(575) 524-8812
btm@mynattspringer.com
hrg@mynattspringer.com
*Attorneys for City Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 5, 2025, a true and correct copy of the foregoing pleading was served upon the following counsel via email and the CM/ECF File and Serve system:

WGLA, LLP
Benjamin Gubernick
Ben@wglawllp.com

Curtis Waldo
curtis@wglawllp.com
*Attorneys for Plaintiff*

HALEY R. GRANT