**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

**RONNIE BROOKS,**

**Plaintiff,**

**v.** **Civ No. 2:24-cv-01276-JHR-GBW**

**JOSHUA THOMAS,**
**T'MADRE[1] HARRIS,**
**JAMES TEAGUE,**
**TAIWAN[2] SMITH,**
**JONAH TREVINO, AND**
**THE CITY OF HOBBS,**

**Defendants.**

**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, DENYING DEFENDANTS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT, AND DISMISSING PLAINTIFF'S MOTION TO STRIKE**

Before the Court are (1) Plaintiff Ronnie Brooks's Motion for Partial Summary Judgment ("Plaintiff's Motion") [Doc. 6], (2) Defendants' Response to Plaintiff's Partial Motion for Summary Judgment and Memorandum in Support and Cross-Motion for Partial Summary Judgment & Qualified Immunity ("Defendants' Cross-Motion") [Doc. 24], and (3) Plaintiff's Motion to Strike declarations submitted by officers in support of Defendants' Response and Cross-Motion ("the Motion to Strike") [Docs. 32; *see* 24-1, 2, 5-8].

Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73(b), the parties have consented to the undersigned Magistrate Judge to conduct dispositive proceedings in this matter, including entering final judgment. [Doc. 9]. Having thoroughly reviewed the parties' submissions

---

[1] Defendants assert that Officer Harris' first name is spelled "T'Mardre." [Doc. 24 at 1].
[2] Defendants assert that Officer Smith's first name is spelled "Tiawan." [*Id.*]

and the relevant law, the Court will deny Plaintiff's Motion, deny Defendants' Cross-Motion, and dismiss Plaintiff's Motion to Strike as moot.

## I. BACKGROUND

### A. The events leading to Plaintiff's arrest[3]

On August 3, 2024, Willie Haynes ("Haynes") called 911 and reported that a man was chasing him with a gun. [Docs. 6 at 3; 24 at 4, 15]. Officers Thomas, Harris, Teague, Smith, and Trevino (collectively, the "Defendant Officers") and Officer Van Zandt responded to the call. [*Id.*]. At about 9:10:20 a.m., Van Zandt began questioning Haynes about the incident and assailant. [Docs. 6 at 4; 24 at 4; Ex. A-1].[4] Teague followed Van Zandt as he began talking to Haynes. [Ex. A-2]. Trevino arrived shortly thereafter. [Ex. A-4; Ex. A-2 at 09:10:30].

As he was talking, Haynes stated his alleged assailant was "driving that black car, right there in front of, right there at that house, his name is Keith Wright. Where the Suburban is." [Docs. 6 at 4; 24 at 4; Ex. A-1 at 9:10:28-36]. Thomas arrived nearby as Haynes said this. [Ex. A-3 at 09:10:33]. As Haynes talked, Van Zandt, Trevino, and Teague all looked away from Haynes toward where Plaintiff was sitting. [Ex. A-3 at 09:10:39-36]. As he looked that direction, Van Zandt asked, "where the Suburban is and that black car?" and Haynes, also looking in that direction, replied, "yeah." [Ex. A-1 at 9:10:36-39; Ex. A-2 at 09:10:36]. Neither Van Zandt nor Teague could see a black car or a Suburban. [Docs. 24 at 16 (stating this fact); 35 at 3 (not

---

[3] The operative facts set forth in this section are (1) affirmatively admitted by the opposing party; (2) not "specifically controverted" by the opposing party, D.N.M.LR-Civ. 56.1(b); and/or (3) taken from the video evidence. Any dispute of fact between the parties not mentioned in this summary is one the Court considers immaterial.

[4] Plaintiff submitted footage from the body worn cameras of Van Zandt, Teague, Thomas, Trevino, and Harris, as Exhibits A-1, A-2, A-3, A-4, and A-6, respectively. [Doc. 6-1]. Both parties rely on the footage to support their respective motions.

specifically disputing this fact)].[5] However, they could see a dark purple Dodge Challenger parked on the street. [*Id.*] Plaintiff, wearing a white shirt, was sitting on the low retaining wall near the Challenger, about 100 yards from the officers. [Docs. 24 at 17; 6 at 5-6; 35 at 4]. Plaintiff was not doing anything suspicious. [Docs. 6 at 6; 24 at 8]. Haynes never described the height, build, race, age, or appearance of his purported assailant, nor did the officers ask for identifying personal information about the assailant. [Docs. 6 at 4; 24 at 6-7].

About 10 seconds after Van Zandt asked, "where the Suburban is and that black car?" and Haynes replied, "yeah," Teague told Thomas that Haynes was "saying it's the guy right there in the white shirt sitting front of the Challenger." [Ex. A-1 at 9:10:36-39; Ex. A-2 at 09:10:45-52; Ex. A-3 at 09:10:45-52]. Thomas then instructed Trevino to "make contact" with the "dude in the white shirt" and pointed down the street toward Plaintiff. [Ex. A-3 at 09:10:57-09:11:02]. Teague also told Smith to "make contact with the dude in the white shirt," adding, "he [Haynes] is saying he is the one that pulled the gun on him." [Ex. A-2 at 09:11:02-09:11:07; Docs. 6 at 5; 24 at 8]. Teague then directed Harris to join Trevino and Smith. [Docs. 6 at 5; 24 at 8]. Trevino, Harris, and Smith drove down the street to where Plaintiff was sitting. [Docs. 6 at 5-6; 24 at 8].

At 9:12 a.m., Harris, Trevino and Smith approached Plaintiff on foot. [Ex. A-6 at 09:12:03-5]. Smith said, "Can you stand up for me?" [*Id.*] Plaintiff asked, "what did I do?" and Smith told him to stand up again. [*Id.*] Within six seconds of approaching Plaintiff, Smith took hold of his left wrist, while Trevino put his hand behind Plaintiff's right shoulder. [*Id.* at 09:12:09-11]. Still holding Plaintiff's left arm, Smith told Plaintiff, "Right now you are being detained because they identified you as somebody that pulled a gun on someone." [*Id.* at 09:12:10-15]. Plaintiff did not

[5] Although Plaintiff seeks to strike the declarations supporting this fact on the ground the officers did not properly sign them, Plaintiff did not specifically dispute this fact in his response to Defendants' Cross-Motion and appears to rely on this fact in his arguments. *See* [Doc. 35 at 3, 8].

stand up and protested loudly that he "just got [t]here" and that he did not have a gun. [*Id.*] Trevino shifted his hand to under Plaintiff's right armpit while Plaintiff told the officers to "put [their] body cam[s] on." [*Id.* at 09:12:20-24]. As Trevino tried to lift Plaintiff up, Plaintiff did not stand up and told the officers to "hold on" and "let [him] talk." [*Id.*] He also referred to calling his uncle. [*Id.*] At that point, Smith was holding Plaintiff's left arm with both hands, and Trevino was trying to make Plaintiff stand up with one hand under his right arm pit. [*Id.*] As the officers pulled at him, Plaintiff said he would stand up once he put down his phone, which was in his left hand. [*Id.* at 09:12:40-44]. Smith took the phone and set it on the retaining wall. [*Id.*] Harris asked Plaintiff his name, and Plaintiff said it was "Ronnie Brooks." [*Id.*; Docs. 6 at 6; 24 at 9]. Then, with the officers still holding his arm and armpit, Plaintiff stood up.[6] [Ex. A-6 at 09:12:50]. As he did so, he yelled "Uncle Keith!", asked if he could call his uncle and said he "wasn't doing nothing." [*Id.* at 09:12:48]. Within seconds of standing up, as the officers were still holding his arm and armpit and Trevino was trying to handcuff him, Plaintiff tried to run away. [*Id.* at 09:12:52]. Less than one minute elapsed between the officers' approach and Plaintiff's attempt to run away. [*Id.*]

Trevino, Smith, and Harris forced Plaintiff to the ground and attempted to handcuff him. [Docs. 6 at 7; 24 at 10]. After a few seconds, Harris tased Plaintiff in the back at least two times. [Docs. 6 at 7; 24 at 10]. The parties differ on how to characterize the officers' conduct: Plaintiff alleges that Trevino, Smith and Harris "gang-tackled" him and that Harris tased him even though he was "wholly incapable of moving" [Doc. 6 at 7], whereas Defendants object to the term "gang tackle" and argue that Plaintiff was "shout[ing] and physical[ly] resist[ing]" while on the ground. [Doc. 24 at 10]. Because, as explained below, the facts about this encounter are not material to the

---

[6] Plaintiff contends Trevino and Smith "physically forced" him to stand up, whereas Defendants argue he stood up "on his own power." [Docs. 6 at 6; 24 at 9].

narrow legal questions before the Court, the Court will not address the factual disputes regarding the officers' conduct after Teague instructed the officers to detain Plaintiff.

The officers arrested Plaintiff for resisting, evading, or obstructing a law enforcement officer in violation of Section 9.04.080 of the Hobbs Municipal Code. [Docs. 6 at 8; 24 at 11]. *See* Hobbs, N.M., Code of Ordinances ch. 9.04, § 9.04.080 (2010, amended 2021). In the criminal proceedings, the Hobbs Municipal Court granted Plaintiff's motion to suppress the evidence against him after hearing testimony by Trevino and watching footage from Trevino's body worn camera. [Docs. 6 at 10; 24 at 14; Ex. 6-1 at 17-19]. All charges against Plaintiff arising from this incident were later dismissed. [Docs. 6 at 11; 24 at 15].

**B. Plaintiff's Complaint**

In his Complaint, Plaintiff alleges the Defendant Officers unlawfully detained, arrested, and used excessive force against him. [Doc. 1]. Plaintiff brings a claim against Defendant City of Hobbs under the New Mexico Civil Rights Act ("NMCRA"), alleging that the City is liable for its officers' violation of Plaintiff's rights under Article II, Sections 4 and 10 of the New Mexico constitution (Count I). [*Id*. at 9-10]. In Count II, Plaintiff asserts a claim under 42 U.S.C. § 1983 against the Defendant Officers in their individual capacities, alleging they violated his Fourth Amendment rights under the United States Constitution when they 1) detained him without reasonable suspicion, (2) arrested him without probable cause, and used excessive force in the arrest. [*Id*. at 11-12]. Plaintiff further alleges the City of Hobbs inadequately trained its officers when to detain a suspect and use force against a subject during an arrest. [*Id*. at 11]. Finally, under the New Mexico Tort Claims Act ("NMTCA"), Plaintiff alleges in Count III that the "Defendant Officers battered Plaintiff when they detained Plaintiff and tased him and/or assisted in tasing him." [*Id*. at 12]. Plaintiff contends all Defendants are subject to a NMTCA waiver of immunity

under N.M. Stat. Ann. § 41-4-12 (2020) for battery, false arrest, false imprisonment, abuse of process, and malicious prosecution based on allegations that the officers battered Plaintiff in detaining and tasing him and filing a criminal complaint containing false statements and knowingly lacking in probable cause. [*Id.*] Plaintiff further asserts the City's prosecutors knew or should have known the criminal complaint contained false statements and lacked probable cause. [*Id.*]

## II. LEGAL STANDARDS

### A. 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. In other words, "[t]o state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States[] and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

### B. Rule 56 Summary Judgment and Qualified Immunity

"Summary judgment is proper if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Halley v. Huckaby*, 902 F.3d 1136, 1143 (10th Cir. 2018). A fact is "material" if it could influence the determination of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" if a" reasonable jury could return a verdict for either party." *Id.*

Generally, the summary judgment movant must first show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the movant meets this burden, the non-moving party "may not rest upon the mere allegations or denials of his pleading[] but must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 248; *Schneider*, 717 F.3d at 767. The nonmovant "cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

The summary judgment standard operates differently when a defendant asserts the defense of qualified immunity. *Est. of Ward by & through Stamp v. Lucero*, 178 F.4th 604, 614 (10th Cir. 2026) (discussing the proper analysis when defendants assert qualified immunity). "Qualified immunity" protects government officials sued in their individual capacity from liability for monetary damages unless their actions violate a "clearly established" constitutional right. *City of Escondido v. Emmons*, 586 U.S. 38, 42 (2019) (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)). "To overcome a qualified immunity defense at summary judgment, 'a plaintiff must (1) raise *a genuine issue of material fact* that the defendant violated a federal constitutional or statutory right, and (2) show the right was clearly established at the time of the defendant's violative conduct.'" *Est. of Ward*, 178 F.4th at 615 (quoting *Teetz ex rel. Lofton* v. *Stepien*, 142 F.4th 705, 722 (10th Cir. 2025)). If the plaintiff fails to meet either part of this test, the court will grant summary judgment on qualified immunity grounds. *Est. of Ward*, 178 F. 4th at 614; *Clark v. Wilson*, 625 F.3d 686, 692 (10th Cir. 2010) (remanding for dismissal of claims with prejudice because qualified immunity applied). In analyzing qualified immunity at the summary judgment stage, the court "construe[s] the facts in the light most favorable to the plaintiff as the nonmoving

party." *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). But "a plaintiff's version of the facts must find support in the record . . . ." *Id.* "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Est. of Beauford v. Mesa Cnty., Colorado*, 35 F.4th 1248, 1261–62 (10th Cir. 2022) (quoting *Gutteridge v. Oklahoma*, 878 F.3d 1233, 1239 (10th Cir. 2018)).

When considering cross-motions for summary judgment, courts "view each motion separately, in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor." *United States v. Supreme Ct. of New Mexico*, 839 F.3d 888, 906–07 (10th Cir. 2016) (quoting *Manganella v. Evanston Ins. Co.*, 702 F.3d 68, 72 (1st Cir. 2012)). The "denial of one does not require the grant of another." *Id*. at 907 (quoting *Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1030 (10th Cir. 2007)).

**C. Local Rule 56**

Local Rule 56 requires the party moving for summary judgment to "set out [in a Memorandum] a concise statement of all of the material facts as to which the movant contends no genuine issue exists." D.N.M. LR-Civ. 56(b). The movant must number the facts "and must refer with particularity to those portions of the record upon which the movant relies." *Id*. In response, the non-moving party must provide "a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist. Each fact in dispute must be **numbered**, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the **number** of the movant's fact that is disputed." *Id*. "All material facts set forth in the Memorandum will be deemed undisputed *unless specifically controverted*." *Id*. (emphasis added).

## III. DISCUSSION

The Court will first outline the relevant law regarding reasonable suspicion, then address Plaintiff's Motion [Doc. 6] and Defendants' Cross Motion [Doc. 24]. The Court will discuss Plaintiff's Motion to Strike [Doc. 32] in those analyses as necessary.

### A. Reasonable Suspicion

"The Fourth Amendment protects individuals from unreasonable seizures." *United States v. Samilton*, 56 F.4th 820, 826 (10th Cir. 2022); U.S. Const. amend. IV. Evidence obtained through an illegal seizure is inadmissible in court. *Samilton*, 56 F. 4th at 826. Citizen-police encounters fall into three types: "(1) consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions which . . . must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause." *Id*. (quoting *United States v. Hammond*, 890 F.3d 901, 904 (10th Cir. 2018)). Plaintiff's Counts I and II implicate the second type—investigatory detentions, "commonly known as Terry stops . . . ." *Samilton*, 56 F. 4th at 826.

Investigatory detentions are constitutional if "the stop was justified at its inception" by "reasonable suspicion" and "the officer's actions during the detention were reasonably related in scope to the circumstances which justified the interference in the first place." *Id*. at 827 (quoting *Vasquez v. Lewis*, 834 F.3d 1132, 1136 (10th Cir. 2016)). "Reasonable suspicion" is often defined in the negative: it is "more than an 'inchoate and unparticularized suspicion or hunch,'" "it is not, and is not meant to be, an onerous standard," and "[t]he level of suspicion required is considerably less than proof by a preponderance of the evidence or that required for probable cause." *Samilton*, 56 F.4th at 827 (quoting *Alabama v. White*, 496 U.S. 325, 329 (1990), *Shaw v. Schulte*, 36 F.4th 1006, 1014 (10th Cir. 2022), and *United States v. Chavez*, 660 F.3d 1215, 1221 (10th Cir 2011), respectively)). "An individual's presence in an area of expected criminal activity, standing alone,

is not enough to support a reasonable, *particularized* suspicion that the person is committing a crime." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).

Stated affirmatively, reasonable suspicion exists when officers have "'a particularized and objective basis for suspecting the particular person stopped' of breaking the law." *Heien v. North Carolina*, 574 U.S. 54, 60 (2014) (quoting *Navarette v. California*, 572 U.S. 393, 396 (2014)). Courts assess whether reasonable suspicion existed objectively; "the officer's subjective motives are irrelevant." *United States v. Chavez*, 534 F.3d 1338, 1344 (10th Cir. 2008). To assess whether an officer had reasonable suspicion to detain an individual, courts consider, "based on the totality of circumstances, whether the facts available to the detaining officer, at the time," would have allowed "an officer of reasonable caution" to believe the action was warranted. *United States v. Cash*, 733 F.3d 1264, 1273 (10th Cir. 2013).

The "same reasonable suspicion standard [applies] when conducting both Fourth Amendment and Article II, Section 10 analyses." *State v. Martinez*, 2020-NMSC-005, ¶ 18, 457 P.3d 254, 259 (stating, "Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)).

"The veracity of identified private citizen informants (as opposed to paid or professional criminal informants) is generally presumed in the absence of special circumstances suggesting that they should not be trusted." *United States v. Brown*, 496 F.3d 1070, 1075 (10th Cir. 2007) (quoting *United States v. Elmore,* 482 F.3d 172, 180 (2d Cir.2007)). For example, in *United States v. Hodges*, the Court held that officers had reasonable suspicion to detain the plaintiff where a non-anonymous victim "informed [an officer] that [the plaintiff] had a firearm in plain view when he threatened [the victim] to get away from his car or there would be trouble." 215 Fed. Appx. 737,

741 (10th Cir. 2007). It noted that, "[w]hile courts have not always accepted a citizen's tip as sufficient to generate reasonable suspicion, [the victim's] tip [wa]s a sufficient basis for reasonable suspicion because the information he provided possessed 'an indicia of reliability'" because it was detailed, the victim was not anonymous, and the officers quickly spotted the car to which the victim referred. *Id*. (quoting *Adams v. Williams,* 407 U.S. 143, 147 (1972)).

Both statements and gestures by alleged victims or other citizen informants can be important indicators of reasonable suspicion under the totality of the circumstances. *See, e.g*., *Hodges*, 215 F. App'x at 738 (noting that the officer concluded, based in part on the victim's "body language and the way he was presenting . . . information," that the victim had been threatened with a gun); *United States v. McKinney*, 328 F.3d 993, 994 (8th Cir. 2003) (the victim's statement and pointing at the alleged perpetrator's truck, combined with the perpetrator's "apparent pursuit of an escape route," provided reasonable suspicion and probable cause); *United States v. Sanchez*, 519 F.3d 1208, 1215 (10th Cir. 2008) (neighbors pointing at vehicles leaving a residence quickly, combined with anonymous tip of a man beating a woman, provided reasonable suspicion); *State v. Kerwick*, 393 S.W.3d 270, 276 (Tex. Crim. App. 2013) (apparent victim at the scene pointing to the alleged perpetrator's car and saying "there they are right there[,] There they are, there they are" "provided a rational basis for [the officer] to infer that th[at] person . . . was identifying the person or persons responsible for the damage").

An officer may have reasonable suspicion even if the suspicion is later revealed to be based on a mistake of fact. *Heien*, 574 U.S. at 61 ("[S]earches and seizures based on mistakes of fact can be reasonable."); *Bustillos v. City of Artesia*, 98 F.4th 1022, 1030 (10th Cir. 2024). However, "[t]he Fourth Amendment tolerates only *reasonable* mistakes, and those mistakes—whether of fact or of law—must be *objectively* reasonable." *Heien*, 574 U.S. at 65.

A detaining officer's actions during the stop must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Samilton*, 56 F. 4th at 827. "Officers are not required to take unnecessary risks and are permitted to take reasonable steps to [e]nsure their safety and to preserve the status quo during a *Terry* stop including the use of handcuffs or placing the subject on the ground." *United States v. Albert*, No. 2:06CR00761DS, 2007 WL 1308977, at *2 (D. Utah May 3, 2007), *aff'd,* 579 F.3d 1188 (10th Cir. 2009); *see also Hodges,* 215 F. App'x at 744 (use of handcuffs is not unreasonable during a *Terry* stop as long as there is some articulable ground for fearing danger from the suspects, which is determined by looking to the objective facts).

The "collective knowledge doctrine" allows reasonable suspicion of one officer to be imputed to another officer. *United States v. Pickel*, 863 F.3d 1240, 1249 (10th Cir. 2017). Under this doctrine, "[w]here one officer knows facts constituting reasonable suspicion . . . , and he communicates an appropriate order or request, another officer may conduct a warrantless stop, . . . without violating the Fourth Amendment." *Id*. (quoting *United States v. Ramirez*, 473 F.3d 1026, 1037 (9th Cir. 2007)). This is true even if the first officer does not communicate "all the information necessary to justify the action" to the second officer. *Id*. (quoting *United States v. Whitley*, 680 F.3d 1227, 1234 (10th Cir. 2012)). "Thus, we consider only whether the officer requesting the stop had [reasonable suspicion], not whether the officer conducting the [stop] independently had" reasonable suspicion. *Pickel*, 863 F.3d at 1249. Framed from a different perspective, "[p]olice officers are entitled to rely upon information relayed to them by other officers in determining whether there is reasonable suspicion to justify an investigative detention . . . , as long as such reliance is 'objectively reasonable.'" *Koch v. City of Del City,* 660

F.3d 1228, 1240 (10th Cir. 2011) (quoting *Oliver v. Woods*, 209 F.3d 1179, 1190-91 (10th Cir. 2000)).

**B. Analysis**

The Court will deny Plaintiff's Motion because Plaintiff has not met his burden to show he is entitled to summary judgment based on undisputed material facts. The Court will also deny Defendants' Cross-Motion. Defendants are not entitled to qualified immunity because Plaintiff has met his burden to show a genuine dispute of material fact regarding whether Defendants acted without reasonable suspicion and that the relevant law was clearly established at the time. In addition, Defendants have not met their traditional summary judgment burden to show they are entitled to summary judgment that they had reasonable suspicion to detain Plaintiff. The Court will dismiss Plaintiff's Motion to Strike because it is moot. The Court will address Plaintiff's Motion first, then Defendants' Cross-Motion. The Court will address the Defendant Officers' declarations and Plaintiff's Motion to Strike in the context of those motions.

The issue before the Court is narrow. First, Haynes provided the only information that could give rise to a "particularized and objective basis for suspecting [Plaintiff] . . . of breaking the law." *Heien*, 574 U.S. at 60. The only information known to the officers before then was that conveyed by dispatch, which consisted of allegations of someone chasing the victim-caller with a gun. [Docs. 6 at 3; 24 at 4, 15; 35 at 3]. Further, at all relevant times, Plaintiff was not acting suspiciously. [Docs. 6 at 6; 24 at 8].

Second, because reasonable suspicion must exist at the inception of the detention, the detaining officers—Harris, Smith, and Trevine—had to have reasonable suspicion to detain him before they approached him. *See Samilton*, 56 F. 4th at 827. Harris, Smith, and Trevino acted on instructions from Teague and Thomas, who acted based on information he received from Teague.

Under the collective knowledge doctrine, Harris, Smith, and Trevino could rely on the information relayed to them by Thomas and Teague if Teague had reasonable suspicion. *See Pickel*, 863 F.3d at 1249.

The question therefore is whether a reasonable officer in Teague's position would have had reasonable suspicion to detain Plaintiff. *See* [Docs. 35 at 2 (stating, "All that matters is, based on the 25 seconds officers had with Haynes prior to Teague's identification of Plaintiff, would a reasonable officer have specific and articulable facts to detain Plaintiff?"); 41 at 25 (stating that "[t]he only question is whether what Officer Teague understood is consistent with a reasonable mistake as to the reasonable suspicion basis to detain Plaintiff")]. For this analysis, the Court focuses on the information known to Teague in the time between when Teague arrived at the scene and when he told Thomas that Haynes had identified Plaintiff. On review of the body worn camera footage, that period is from 09:10:20 to 09:10:45 ("the Relevant Period"). [Ex. A-2 at 09:10:20-09:10:45; Ex. A-3 at 09:10:45].[7]

*1. Plaintiff's Motion*

Plaintiff argues that he is entitled to summary judgment because (1) Haynes did not specify any personal characteristics or clothing of the person who chased him, and named the person as "Keith Wright," which was not Plaintiff's name (2) Plaintiff was not acting suspiciously, (3) dispatch informed the officers only that an identified victim reported being chased by someone with a gun, and (4) Haynes never pointed toward Plaintiff or toward any vehicle at the west end of

---

[7] Plaintiff states Teague told Thomas that Haynes had identified Plaintiff at 09:10:52. [Doc. 31 at 3]; *but see* [Doc. 6 at 5 (stating that Teague "identified 'that guy in the white shirt' as the purported assailant" citing Ex. A-2 and A-3 at 09:10:45)]. However, the footage contradicts that assertion, because it shows that Teague turned away from Haynes toward Thomas at 09:10:45 and began telling him that Haynes identified Plaintiff at 09:10:49. [Ex. A-2 at 09:10:45; Ex. A-3 (showing Teague walking toward Thomas at 09:10:45 and beginning to tell Thomas that Haynes identified Plaintiff at 09:10:49)].

the street at the relevant time. [Docs. 6 at 12; 31 at 2; *see also* 35 at 3 (citing Ex. A-2 at 09:10:24-09:10:49). Plaintiff contends that these facts do not give rise to reasonable suspicion and that the Defendant Officers therefore violated his Fourth Amendment and Article II, Section 10 rights to be free from unreasonable seizures.

Citing to body worn camera footage, Plaintiff asserted in his Motion that it was undisputed that "Haynes gestured toward the western end of the street, which was approximately 100 yards away, and said the person who assaulted him was 'at that house[.]'" [Doc. 6 at 4 (citing Ex. A-1 at 9:10:30)]. In both their response to Plaintiff's Motion and in their Cross-Motion, Defendants agreed with this purportedly undisputed fact and, in keeping with their summary judgment burden, asserted as an additional statement of undisputed fact that Haynes gestured to the west, in Plaintiff's direction, as he was talking. [Doc. 24 at 16]. In support, Defendants relied on declarations by Van Zandt and Teague stating that Haynes "pointed west down the street" and "pointed out a house," respectively. [*Id*. (citing Docs. 24-1, 24-2].

In his reply to his Motion, however, Plaintiff stated that the footage does "not show Haynes pointing toward . . . the western end of the street" and stated that "Haynes does not appear to have pointed in that direction at all." [Doc. 31 at 11]. Similarly, in his response to the Cross-Motion, Plaintiff disputed that Haynes pointed west "toward Plaintiff or toward any vehicle at the west end of the street" during the Relevant Period. [Doc. 35 at 3 (citing Ex. A-2, 9:10:24 through 9:10:49)].

Plaintiff has not met his summary judgment burden because he did not support either assertion about Haynes' gestures. The Court has carefully reviewed the footage from cameras worn by Harris, Smith, Thomas, Trevino, and Van Zandt. In fact, none of them capture Haynes gesturing during the Relevant Period, and Haynes is not even visible in much of that footage. [Ex. A-1 to A-4; Doc. 31 at 11 (acknowledging that the footage does not show Haynes gesturing)]. Because that

footage does not capture Haynes much at all, the footage cannot establish whether Haynes did or did not gesture.

However, the footage shows that, as Haynes talked, Van Zandt, Trevino, and Teague all looked away from Haynes toward where Plaintiff was sitting. [Ex A-2 at 09:10:33]. As he looked that direction, Van Zandt asked, "where the Suburban is and that black car?" and Haynes, momentarily visible, looked in that direction and replied, "yeah." [Ex. A-1 at 9:10:38; Ex A-2 at 9:10:37]. Viewed in the light most favorable to the non-movant Defendants, the Court finds that reasonable jurors could find, based on the officers' reactions in addition to Haynes' use of the phrases "*that* black car, *right there* in front of, *right there* at *that* house" and "Where the Suburban is," that Haynes was gesturing in the direction the officers turned, i.e., toward Plaintiff.

Plaintiff's evidence does not show otherwise. Plaintiff is correct that at 09:10:47, Haynes started describing to Van Zandt how the alleged perpetrator chased him and gestured to his right and behind him in the direction of a white pickup—away from where Plaintiff was sitting—as he did so. *See* [Doc. 35 at 3; Ex. A-2 at 09:10:47; Ex. A-3 at 09:10:47]. But at that point, Teague had already turned to Thomas and begun telling Thomas that Haynes had identified Plaintiff. [Ex. A-2 at 09:10:45; A-3 at 09:10:45]. The fact that Haynes gestured behind him away from Plaintiff's direction at 09:10:47 does not address whether he gestured or pointed toward Plaintiff during the Relevant Period.

Just as important as whether Haynes gestured at all is whether Teague reasonably interpreted his gestures to refer to Plaintiff. *See Heien*, 574 U.S. at 60 (officers must have "a particularized and objective basis for suspecting the particular person stopped of breaking the law"). Plaintiff asserts that, even if Haynes gestured, "Haynes was not pointing at any individual

person; he was pointing at a group of houses. There were at least three houses in the area at which he pointed, and it was not even clear which house Haynes had identified." [Docs. 6 at 4; 31 at 10].

Plaintiff relies on his own declaration in support of this assertion. [Doc. 6 at 4]. Because he was roughly 100 yards away at the time, Plaintiff has no personal knowledge of Haynes' communication with Van Zandt. However, in paragraph seven of the declaration, Plaintiff states that, in the suppression hearing in municipal court, Trevino "admitted" that Haynes "merely gestured in the general direction of some houses adjacent to the sidewalk on which [Plaintiff] was sitting." [Docs. 6 at 4; 6-2 at 2]. Defendants argue the Court must disregard paragraph seven because it is not based on Plaintiff's personal knowledge. [Doc. 41 at 5]. The Court finds paragraph seven establishes only that Plaintiff heard Trevino testify about Haynes' gestures at the suppression hearing. The Court will disregard Plaintiff's self-serving characterizations of Trevino's testimony. ! *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991) (stating that "conclusory and self-serving affidavits are not sufficient"). Hence, Plaintiff's declaration does not establish that Haynes' gestures were too vague to allow an officer to infer they referred to Plaintiff.

Defendants argue that Haynes was gesturing not to a house but toward a specific location by also stating "that black car, right there in front of the, right there at th[at] house," and that Plaintiff was sitting near the only dark colored car visible in that direction. [Doc. 24 at 4-5]. Thus, they argue that it was reasonable to infer that Haynes was directing the officers toward Plaintiff but concede that it would have been "very difficult to determine exactly where Mr. Hayne[s]'s finger was pointed . . . ." [*Id.* at 5].

The reasonable suspicion inquiry is fact intensive. *United States v. Gaines*, 918 F.3d 793, 802 (10th Cir. 2019). Haynes' body language and the interpretation of it are important aspects of the totality of the circumstances informing whether a reasonable officer would have had reasonable

suspicion to detain Plaintiff, particularly where it is undisputed that there was no black car visible, Haynes did not verbally describe Plaintiff, and Plaintiff was 100 yards away. Haynes' gestures and body language potentially added meaning to his spoken communication referring to "that house" and "that black car." But because the parties' dispute the proper interpretation of Haynes' body language and the footage does not allow the Court to assess it, the Court finds there are genuine disputes of material fact precluding a determination of whether it was reasonable to infer they identified Plaintiff. *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002) (stating that "[w]here a disputed issue of material fact remains . . . [t]he court may not move on to determine whether an officer's actions were 'objectively reasonable'"); *Teetz*, 142 F.4th at 721 (stating that where "two versions of events could be true, . . . there is a material factual dispute . . . ."); *cf. Benavidez v. Shutiva*, 2015-NMCA-065, ¶ 27, 350 P.3d 1234, 1246 (holding that, where the issue depended "in part on interpretation of" the plaintiff's arm movements and "demeanor[], . . . the interpretation of the" plaintiff's body language in the dash camera footage gave "rise to a dispute over material facts related to the existence of probable cause"); *Perez v. City of Albuquerque*, 2012-NMCA-040, ¶ 10, 276 P.3d 973, 976 (holding that because the video was incomplete and reasonable jurors could interpret the events shown differently, "[w]hether the actions of the [o]fficers were unreasonable under the circumstances was a question for the jury to decide").

The Court therefore will deny summary judgment to Plaintiff on whether Teague had reasonable suspicion to detain him at the outset of the encounter. Given this ruling and because Plaintiff does not argue in his Motion that Defendant Officers exceeded the scope of reasonable

suspicion while detaining him,[8] the Court need not address whether the officers' actions during the detention were constitutional.

2. *Defendants' Cross-Motion*

In their Cross-Motion, Defendants first argue they are entitled to summary judgment because the undisputed facts establish they had reasonable suspicion to detain Plaintiff. [Doc. 24 at 26]. Next, they argue summary judgment based on qualified immunity is proper because (1) reasonable officers could have believed they had reasonable suspicion to detain Plaintiff, and therefore Plaintiff cannot show his detention violated a constitutional right, and (2) Plaintiff cannot show the alleged violation was barred by clearly established law. [Doc. 24 at 50]. *See Cortez v. McCauley*, 478 F.3d 1108, 1120 (10th Cir. 2007) (an officer "is entitled to qualified immunity if a reasonable officer could have believed that [reasonable suspicion] existed to . . . detain the plaintiff").

Because Defendants bear "the traditional burden" of a summary judgment movant only if Plaintiff meets his burden in the qualified immunity analysis, the Court will address qualified immunity first. *See Est. of Beauford*, 35 F.4th at 1261–62. To avoid summary judgment based on qualified immunity, Plaintiff bears the burden to show there are unresolvable factual disputes relevant to whether a constitutional violation occurred and that the right allegedly violated was clearly established. *Id.* at 1262; *Est. of Ward*, 178 F.4th at 615. Although Plaintiff bears the burden, the Court still views the evidence in the light most favorable to him. *Works v. Byers*, 128 F.4th 1156, 1163 (10th Cir. 2025). Summary judgment based on qualified immunity is also inappropriate when the Court cannot determine whether a constitutional violation occurred because "the

---

[8] Plaintiff cites cases addressing the scope of a detention based on reasonable suspicion but does not argue that the Defendant Officers exceeded the scope of the detention. [Docs. 6 at 16 n.89; 31].

facts . . . , considered collectively, present an incomplete picture of the [relevant] circumstances." *Olsen*, 312 F.3d at 1314 (quoting *Salmon v. Schwarz*, 948 F.2d 1131, 1137 (10th Cir. 1991)).

Here, whether a reasonable officer could have believed that Haynes was identifying Plaintiff with his gestures and statements depends on (1) whether Haynes gestured toward Plaintiff in the Relevant Period and (2) an assessment of reasonable interpretations of those gestures in the totality of the circumstances. As discussed above, the disputes over these issues and the incomplete picture presented by the evidence does not allow the Court to assess the reasonableness of the officers' actions.

Moreover, it was clearly established that Plaintiff's detention was constitutional only if Teague acted on specific, articulable facts that Plaintiff had committed a crime when he instructed the detaining officers to approach Plaintiff. "To be clearly established," there must be Supreme Court or Tenth Circuit precedent "that would have put an objective officer . . . on notice that he was violating" the plaintiff's rights. *Emmett v. Armstrong*, 973 F.3d 1127, 1137 (10th Cir. 2020) (quoting *Est. of Ceballos v. Husk*, 919 F.3d 1204, 1213 (10th Cir. 2019)). To show that the relevant law was clearly established, a plaintiff cannot rely only on general rules about reasonable suspicion unless they clearly and obviously apply. *Halley,* 902 F.3d at 1149. But "a prior case need not be exactly parallel to the conduct [at issue] for the officials to have been on notice of clearly established law." *Id*.

As relevant here, the law was clearly established that a person's mere proximity to an alleged crime is not enough to establish reasonable suspicion to detain him. *Wardlow*, 528 U.S. at 124. Additionally, it was clearly established that officers must have articulable facts specific to the detainee: "A police officer cannot legally detain a person simply because criminal activity is afoot. The particular person that is stopped must be suspected of criminal activity." *Romero v. Story*, 672

F.3d 880, 887–88 (10th Cir. 2012) (quoting *United States v. Fisher,* 597 F.3d 1156, 1158–59 (10th Cir. 2010)). Finally, it was clearly established that statements providing details or identifying an alleged perpetrator by non-anonymous witnesses or victims may be given substantial weight. *Brown*, 496 F.3d at 1075.

Two Tenth Circuit cases, both discussed by the parties, illustrate the operation of these principles and are analogous enough to the facts here to provide clearly established law. In *Romero*, on which Plaintiff relies [Doc. 6 at 17], the police received two non-anonymous reports by the victim: one stating that his car had been vandalized in a parking lot near an apartment building and that a Hispanic man had been seen in the parking lot, and one stating that the Hispanic man had gone into a certain apartment. 672 F.3d at 883, 888. The victim did not see the Hispanic man vandalizing his car. *Id*. at 888. The Court held that the victim's reports, though not anonymous, were not enough to justify detention of the Hispanic man because the victim did not see the Hispanic man vandalize his car and emphasized that "[a] person of a particular race standing in a parking lot where a crime occurred is not enough to create reasonable suspicion." *Id*.

The *Romero* Court distinguished those facts from *Sanchez*, on which Defendants rely. *Id*. at 887. [Doc. 24 at 51-52]. In *Sanchez*, a woman "flagged down" officers to tell them she had witnessed a "man in a gray shirt striking a woman in the face at a nearby intersection." 519 F.3d at 1211. The officers went immediately to that intersection where they saw two vehicles "pulling quickly away from" a home and multiple "individuals . . . pointing to the two vehicles as if to say[,] "that's them." *Id*. The Court held the officers had reasonable suspicion to stop the defendant because, although the witness did not give her name, she "reported the assault . . . in a face-to-face encounter," which "allowed the police an opportunity to evaluate her credibility and demeanor." *Id*. at 1213. Most germane to the issue before the Court in this case, the witness's tip was "not

overly general" because it referred to a location only a block away *and* stated the perpetrator was wearing a gray shirt. *Id*. at 1214. Thus, "the tip did not provide the officers with excessive discretion to stop and search a large number of citizens—this was not a dragnet." *Id*. Finally, the officers also saw two vehicles speeding away from a home in that location and individuals pointing at those vehicles in an implicating way. *Id*. at 1214-1215. The Court noted that "each individual factor might not have been sufficient to establish reasonable suspicion," but held that considering the totality of these circumstances, the information was specific enough to the defendants that the officers had reasonable suspicion to stop the defendants. *Id*. at 1215.

Together, these cases show that, to provide reasonable suspicion, information known to officers must be sufficiently specific to the detainee and make a connection between the alleged crime and the detainee, and that officers may credit information provided by non-anonymous witnesses to the extent the information meets these criteria. In other words, it was clearly established in Tenth Circuit case law that reasonable suspicion does not exist if the officers' knowledge is derived mostly from a victim report and the victim does not provide information that connects the detainee to the alleged crime or provides only general information that encompasses a "large number of citizens," even when the witness is reporting the crime face to face to officers. *Id*. at 1214. Under this law, a reasonable officer under the circumstances here would have been on notice that, unless Haynes' communications, including gestures and statements, connected Plaintiff to the alleged crime, Plaintiff's detention violated his right to be free from seizures not based on reasonable suspicion.

The Court finds that a genuine dispute about and the incomplete picture provided by the evidence related to whether and how Haynes gestured in his communication with the officers prevents the Court from determining whether a reasonable officer could have believed that

reasonable suspicion existed to detain Plaintiff. And Plaintiff's constitutional right to be free from detention in the absence of reasonable suspicion based on articulable facts connecting him to an alleged crime was clearly established at the time Plaintiff was detained. Under these circumstances, summary judgment based on qualified immunity is not appropriate. *Est. of Ward*, 178 F.4th at 615.

Since Plaintiff has carried his burden regarding qualified immunity, Defendants bear the burden to establish they are entitled to summary judgment based on the undisputed facts. *Est. of Beauford*, 35 F.4th at 1261–62 (stating that a defendant "bear[s] the traditional" summary judgment burden if plaintiffs bear their burden as to qualified immunity)). Defendants have not met that burden. The footage does not show Haynes' gestures and does not provide a basis for the Court to assess whether, as Defendants assert, they reasonably understood Haynes to be directing their attention toward Plaintiff.

Moreover, the declarations by Teague and Van Zandt stating that Haynes "pointed west down the street" and "pointed out a house," respectively, are insufficient for several reasons.[9] [Docs. 24-1; 24-2]. First, although they appear to state events chronologically, the Van Zandt and Teague declarations do not specify when Haynes allegedly pointed, which, as discussed, is essential to the analysis of whether Teague reasonably inferred that Haynes had identified Plaintiff in the Relevant Period. The timing of Haynes' gestures vis á vis Teague's instructions to the detaining officers is therefore important. Without this information in the declarations, the Court cannot conclude they establish that Haynes pointed or gestured during the Relevant Period.

---

[9] In his Motion to Strike, Plaintiff argues that the Court cannot consider the declarations in deciding the Plaintiff's Motion or Defendants' Cross-Motion because they do not comply with the requirement in 28 U.S.C. § 1746 that the declarant must sign the declaration. [Doc. 32]. The Court finds the Motion to Strike is moot because (1) the Court finds Van Zandt's and Teague's declarations do not support Defendants' Cross-Motion and (2), except as noted in footnote 5, the declarations are not necessary to and have not been relied on for the Court's analysis. Consequently, the Court will not address the Motion to Strike further and will dismiss it as moot.

Further, viewed in the light most favorable to Plaintiff, the officers' statements in the declarations suggest that Haynes identified a house or a car, not Plaintiff. In his declaration, Van Zandt stated that "Mr. Haynes *pointed out a house* where a male in a white shirt with a long beard was sitting in front explaining that the *subject was driving a black car* that was parked in front of a house down the street *near a suburban* east of where we were at 1403 East White." [Doc. 24-1 at 2 (Emphasis added.)]. He went on, "I did not see a black car parked in front of any house where Mr. Haynes pointed, so I asked if he was referring to the purple car, or a purple Dodge Challenger, that was parked in front of 1403 East White." [*Id*.] However, the footage shows Van Zandt did not ask about a purple Challenger, but about a Suburban and "that black car." [Ex. A-1 at 9:10:25-38; Ex A-2 at 9:10:37]. Because neither of those vehicles was visible to Van Zandt, Haynes' response ("yeah") did not provide a connection between Plaintiff and the purple Challenger or the house by which it was parked.

In his declaration, Teague similarly described Haynes' statements and gestures as referring to a vehicle:

> Mr. Haynes pointed west down the street and went on to say that [the person who chased him] was driving a black car parked in front of a house down the street near a suburban and went by the name Keith Wright. . . .What I could see from where we were was the dark purple Dodge Challenger and a white Dodge Durango where Mr. Haynes seemed to be pointing, but I did not see a suburban. . . . The only dark in color car I saw in front of any houses in that area was a dark purple Dodge Challenger parked in front of 1403 East White, and so I thought that this was the vehicle Mr. Haynes identified as the one Mr. Wright was driving.

[Doc. 24-2 at 2 (also stating that Haynes "described the vehicles directing our attention down the road")].[10] Teague appears to acknowledge that Haynes' gestures were ambiguous by stating that

---

[10] Defendants ask the Court to take judicial notice of the addresses of the houses near where they encountered Haynes and where Plaintiff was sitting, [Doc. 24 at 16 n.6], apparently to resolve some discrepancies in the Van Zandt and Teague declarations. For example, Teague stated that Haynes pointed west whereas Van Zandt stated the house to which Haynes pointed was "east of where [the officers]

he did not see the vehicles Haynes described "where [he] seemed to be pointing . . . ." [*Id*.]. Indeed, Defendants concede that "[f]rom 100 yards away, it would be very difficult to determine exactly where Mr. Hayne[s]' finger was pointed nor is there footage definitively showing this." [Doc. 24 at 5]. Again, reasonable suspicion to detain a person must be specific to that person. *Heien*, 574 U.S. at 60. Even if the Van Zandt and Teague declarations establish that Haynes pointed or gestured at some time, viewed in the light most favorable to Plaintiff, they do not establish that Haynes' gestures implicated Plaintiff during the Relevant Period.

Because Defendants have not met their burden, the Court will deny summary judgment that Defendants had reasonable suspicion. This conclusion forecloses summary judgment that the Defendant Officers had probable cause to arrest Plaintiff for resisting, evading, or obstructing a law enforcement officer under Section 9.04.080 of the Hobbs Municipal Code. [Doc. 24 at 3, 46]. Section 9.04.080 is nearly identical to New Mexico's statute criminalizing resisting arrest (N.M. Stat. Ann., Section 30-22-1(B) (1981)) and the New Mexico courts have treated them the same. *See, e.g.*, *City of Hobbs v. Wright*, No. A-1-CA-39028, 2022 WL 473701, at *4 (N.M. Ct. App. Feb. 16, 2022) (unreported). Defendants also rely on cases addressing Section 30-22-1(B) in support of their arguments regarding Section 9.04.080. *See, e.g.*, [Doc. 24 at 47].

Under Section 30-22-1(B), "an officer's intention to initiate an investigatory detention *supported by reasonable suspicion* followed by the suspect's flight is necessary to justify an arrest . . . ." *Romero*, 672 F.3d at 886 (Emphasis added.); *State v. Gutierrez*, 2007-NMSC-033, ¶ 31, 162 P.3d 156, 167 (stating that "a person who walks away from an officer attempting to

---

were . . . ." [Docs. 24-1 at 2; 24-2 at 2]. In addition, Van Zandt stated in his declaration that the officers were talking to Haynes near 1506 East White, then stated they were near 1403 East White, then that the Challenger was in front of 1403 East White. [Doc. 24-1 at 2]. Nevertheless, the Court declines to take judicial notice of the addresses as doing so is not necessary to the Court's analysis.

detain that person based on reasonable suspicion can be charged with evading and eluding an officer under Section 30–22–1(B)”). Hence, to determine whether an officer had probable cause to arrest a defendant for resisting arrest under § 30-22-1(B), courts first “must determine whether [the officers] had any grounds for reasonable suspicion prior to” the defendant’s “alleged flight.” *Id*. Since the Court will deny the current motions as to reasonable suspicion, it will also deny Defendants’ motion for summary judgment on probable cause.

**C. Conclusion**

For the foregoing reasons, the Court concludes that neither party is entitled to partial summary judgment currently and that Plaintiff’s Motion to Strike is moot.

**IT IS THEREFORE ORDERED:**

(1) Plaintiff Ronnie Brooks’s Motion for Partial Summary Judgment [Doc. 6] is **DENIED**,

(2) Defendants’ Cross-Motion for Partial Summary Judgment & Qualified Immunity [Doc. 24] is **DENIED**, and

(3) Plaintiff’s Motion to Strike [Doc. 32] is **DISMISSED** as moot.

Jerry H. Ritter
United States Magistrate Judge